**Steven A. SCHWARTZ**

v.

**COUNTY OF MONTGOMERY; Montgomery County Board of Prison Inspectors; and Lawrence Roth in his official and personal capacity.**

**Civ. A. No. 92–CV–1552.**

United States District Court,
E.D. Pennsylvania.

Feb. 3, 1994.

Jerome M. Marcus, Berger & Montague, P.C., Philadelphia, PA, for plaintiff.

George B. Ditter, Jenkins, Tarquini & Jenkins, Ambler, PA, for defendants.

## DECISION

JOYNER, District Judge.

The instant civil rights action was tried before the undersigned without a jury on August 16–18, 1993 and September 8, 1993. The parties subsequently submitted their proposed findings of fact and conclusions of law in late September, 1993 and the matter is now ready for disposition. In accordance with the requirements of Fed.R.Civ.P. 52(a), this Court now makes the following factual findings and legal conclusions.

## FINDINGS OF FACT

1. The plaintiff Steven A. Schwartz is an adult individual who was convicted of the crimes of trespass and disorderly conduct in the Montgomery County, Pennsylvania Court of Common Pleas and bank fraud in the United States District Court for the Eastern District of Pennsylvania. (N.T. 8/16/93, 2).

2. The Montgomery County Correctional Facility ("MCCF") formerly known as the Montgomery County Prison, is located in Eagleville, Pennsylvania and was established under and is governed by Act No. 242, approved April 8, 1851, P.L. 388. Under the terms of that Act, the affairs of the Correctional Facility are managed by the six-member Board of Prison Inspectors, three of whose members are appointed by the Board of Commissioners of Montgomery County and three of whom are appointed by the judges of the Court of Common Pleas of Montgomery County. (N.T. 8/18/93, 34).

3. The defendant, Lawrence Roth is an adult individual who has been employed as the Warden of MCCF since the facility opened in 1986. Prior to 1986, Mr. Roth was employed as the Warden of the Montgomery County Prison in Norristown, Pennsylvania. (N.T. 8/17/93, 55).

4. Although he has delegated much of the authority for developing and implementing the policies and standard operating procedures to be followed at MCCF to the Assistant Wardens, Warden Roth is ultimately responsible for approving and ensuring that those policies and procedures are properly implemented. Warden Roth, in turn, reports directly to the Board of Prison Inspectors

which has the authority to direct that changes in the operating procedures and policies be made. (N.T. 8/17/93, 56–58).

5. The Montgomery County Board of Prison Inspectors holds regular meetings, inspects the correctional facility on a monthly basis and is regularly given reports on the prison population. (N.T. 8/17/93, 58).

6. On July 16, 1990, Steven Schwartz was transported from the Federal Correctional Institution at Raybrook, New York, where he was serving a federal sentence on his bank fraud conviction to the Montgomery County Correctional Facility to attend a post-conviction hearing with respect to his trespassing/disorderly conduct conviction. Because of his status as an in-transit prisoner, Mr. Schwartz was classified a medium maximum security inmate and assigned to Cell # 422 in Section K–4 of the facility. (N.T. 8/16/93, 2–3, 20–23; Exhibit D–18).

7. In 1990, Assistant Warden Dennis Molyneaux developed the Inmate Classification Policy and the Standard Operating Procedures which were in effect at MCCF in July, 1990. Under Chapters 41 and 44 of the facility's Standard Operating Policies and Procedures, there are 14 different types of classifications for inmates. These classifications include general population, maximum security, medium maximum security, administrative segregation, medical observation, disciplinary segregation, pre-hearing segregation, awaiting transfer, work release, farm, intake, weekender, 48 hours, and community service. (N.T. 8/18/93, 34–35; Exhibits D–2, D–3).

8. As a general rule, classification of an inmate begins immediately upon his or her entry to MCCF and, under Chapter 41 of the prison's Standard Operating Procedures, such factors as age, sex, charges, bond, prior bookings, legal status, current offense, mental and physical health, condition and history, detainers, enemies and the number of co-defendants (if any) are considered. (N.T. 8/17/93, 59; 8/18/93, 39–40; Exhibit D–2). The institution automatically classifies all in-transit prisoners from other county, state or federal facilities as either maximum or medium maximum security because usually only limited information about those prisoners is available. (N.T. 8/17/93, 59–71; 8/18/93, 39–42).

9. In addition to the factors outlined in Chapter 41 of the Standard Operating Procedures ("SOP"), the booking officers and social service counselors also consider the individual's past history at MCCF, his conduct and behavior at the time he is being interviewed and whether or not he is an escape risk. (N.T. 8/18/93, 43). As of July, 1990, the correctional facility had computerized records of inmates dating from its opening in 1986 as well as paper files from both MCCF and the old Montgomery County Prison available for review. (N.T. 8/18/93, 44–45).

10. If an individual inmate disagrees with his classification, he may appeal it to the prison's classification committee, which is composed of members from the administration and the treatment and security departments. MCCF inmates are given this option when they are presented with the inmate classification committee form at the time of their intake meeting with a social services counselor shortly after their admission to the facility. At that time, they are also given a copy of the MCCF Inmate Guidelines. Mr. Schwartz did not appeal his classification. (N.T. 8/18/93, 45–46; Exhibit D–18).

11. Medium maximum inmates are afforded more freedom and privileges than are maximum security prisoners. Medium maximum prisoners, though segregated from the general prison population, are permitted free access to the dayroom in the section in which they are being housed except for lockup times and head counts. They are allowed to recreate with the other inmates in their section during their scheduled two-hour recreation periods. Although they are fed separately from the general population, they may take their meals either in their cells or at the table in the dayroom with the other prisoners in their section.

12. Maximum security inmates are locked in their cells 22 hours per day. Pursuant to the Pennsylvania state minimum standards and procedures governing county jails, (37 Pa.Code § 95.238) MCCF is required to provide all prisoners with two hours' a day of physical exercise in the open (weather per-

mitting) or, if the weather is inclement, two hours' daily indoor physical exercise. (N.T. 8/18/93, 47–48, 79; Exhibit D–4).

13. The inmate classification system at MCCF was developed to comply with the requirements of Pennsylvania state law, to assure the security of the institution and the protection of the community and to assure the welfare of the inmates themselves. (N.T. 8/18/93, 37–38; Exhibit D–4).

14. MCCF houses its maximum and medium maximum security prisoners in those sections of the prison designated as "K" and "L" pods. Each pod, in turn, is divided into six sections with each section containing to the extent possible only either maximum or medium maximum security inmates. Pods K–4, L–5 and L–6, however, have been delineated to hold a combination of medium maximum security, maximum security and administrative, pre-hearing or disciplinary segregated inmates. (N.T. 8/18/93, 67–68, 38–39, 80–81; Exhibit D–2).

15. Section 4 of K–Pod at MCCF consists of eight single person cells grouped in a semi-circular fashion around a dayroom which contains a television set and a table and chairs. Each cell contains its own toilet facilities and there is a common shower area dividing the cells into a four by four configuration. One of the dayroom walls, in turn, contains the guard's control room. (N.T. 8/16/93, 25–28; Exhibit D–1).

16. Whenever necessary, correctional officers at MCCF are apprised of situations involving certain inmates and are informed about the past histories, conditions, etc. involving particular inmates at the roll call conducted at the start of each shift. (N.T. 8/16/93, 92–94, 96–97; 8/17/93, 74–76; 8/18/93, 86–88).

17. Notwithstanding that the MCCF correctional officers may be informed that a particular inmate is dangerous or has a past history that may indicate a propensity for violence toward others, the institution has no policy for and this information is not relayed to the other inmates. (N.T. 8/16/93, 33, 95–97).

18. It is the responsibility of the correctional officers at the Montgomery County Correctional Facility to ensure that the inmates incarcerated at the facility are kept safely from one another. (N.T. 8/16/93, 96).

19. It is the unwritten policy of MCCF that medium maximum security prisoners are given the option of recreating in the yard or in the dayroom and are permitted to walk to and from the exercise yard together and unescorted during their scheduled two-hour recreation periods. Unlike medium maximum security inmates, maximum security prisoners must be escorted to and from their cells to the yard by a supervisor, who remains in the yard with them during the recreation period. (N.T. 8/17/93, 73–76; 8/16/93, 83–85, 90–91).

20. On July 20, 1990, an inmate by the name of Brian Sanders was transported from the Pennsylvania State Correctional Institution in Pittsburgh to the Montgomery County Correctional Facility. Mr. Sanders was classified as a maximum security inmate and was housed in Cell # 426 in Section 4 of K–Pod. (N.T. 8/17/93, 106–107; 8/18/93, 86; Exhibit P–7).

21. Mr. Sanders had been incarcerated at MCCF and the Montgomery County Prison some seven times previously since 1982. In the course of each prior incarceration, as reflected in the prison's records, Mr. Sanders exhibited extremely aggressive, anti-social, violent behavior and had attacked, fought with and, on one occasion, raped another inmate in the facility. The purpose of Mr. Sanders' July 20, 1990 transfer from SCI Pittsburgh to MCCF was to enable him to attend his scheduled July 23, 1990 sentencing on his conviction for the rape and assault of the other MCCF inmate in September, 1989. (N.T. 8/17/93, 106–112; Exhibits P–5, P–8— P–31).

22. Because of Mr. Sanders' history of violent behavior at both the Montgomery County Prison and the Correctional Facility and because he presented a danger to the staff, himself and other inmates, the Assistant Warden in charge of custody, Julio Algarin, directed that anytime Brian Sanders stepped out of his cell, he was to be escorted by both a supervisor and a correctional officer. Assistant Warden Algarin's orders

were noted on the Daily Operations Summary under the heading "Recommendations" for July 20, 1990 and were to be made known at roll call for all shifts and to all department heads. The orders, however, were not repeated or included on the Daily Operations Summaries for July 21 or July 22, 1990. (N.T. 8/18/93, 86–88; 8/17/93, 76–80; Exhibits D–12—D–14).

23. As a general rule, in those sections of the prison housing a combination of maximum and medium maximum security prisoners, if the weather permits, maximum security prisoners are escorted to the yard by a supervisor or a correctional officer for their two-hour recreational period while the medium maximum security prisoners remain inside. If the weather is inclement or while all of the medium maximum security inmates are recreating outside in the yard, the prison supervisors may decide to give the maximum security inmates their recreation time in the dayroom. Should a medium maximum security inmate elect to return from the yard to his pod before the two-hour recreation period is up, he is to be locked in his cell. (N.T. 8/18/93, 93–95, 102; 8/16/93, 80–85; 8/17/93, 116–121). This policy, however, is not written and is not a part of MCCF's Standard Operating Procedures. (N.T. 8/18/93, 95–97).

24. On July 23, 1990, Brian Sanders appeared before the Honorable Stanley Ott of the Montgomery County Court of Common Pleas for sentencing on his April, 1990 conviction for raping another MCCF inmate. In addition to noting that Mr. Sanders' criminal history began at the age of eleven and that he was first convicted of a violent, sex crime at the age of thirteen, Judge Ott found some six aggravating factors with respect to the September, 1989 offense. Upon being sentenced to the maximum possible sentence of 10 to 20 years to run consecutive to all other sentences previously imposed, Mr. Sanders exploded in a violent fit of rage, disrupting the courtroom and requiring three sheriff's deputies, a county detective and the assistant district attorney to physically subdue him. (N.T. 8/17/93, 130–131; Exhibits P–5, P–6).

25. At the July 23, 1990 sentencing, Judge Ott further recommended and noted on the sentencing sheet that Mr. Sanders should be segregated as much as possible from all other inmates in whatever institution to which he is ultimately sent. (Exhibits P–5, P–36).

26. On July 23, 1990, the Daily Operations Summary contained the notation that as per (Shift Commander) Captain R. Gould, Jr., Brian Sanders was to be moved in hand and leg restraints when being escorted. (N.T. 8/17/93, 132–134; Exhibit D–15).

27. The officials at MCCF had been informed about Brian Sanders' outburst in Judge Ott's courtroom on July 23, 1990. (N.T. 8/17/93, 135–136).

28. At approximately 12:30 p.m. on July 24, 1990, during the scheduled recreation time for Section 4 of K–Pod, five of the six medium maximum security prisoners then being housed there went outside to the yard. (N.T. 8/17/93, 12–13). Steven Schwartz, who was then using the telephone, remained in the section. (N.T. 8/16/93, 3, 32, 34–40; Exhibit P–45) Shortly thereafter and notwithstanding that Mr. Schwartz was still in the dayroom, the correctional officer on duty in the K–Pod control booth, Daymond Davenport, informed his supervisor, Lieutenant John Rizzutto, that all 6 of the medium maximum security prisoners had gone to the yard. Lt. Rizzutto then directed Officer Davenport to let Brian Sanders out of his cell so that he could take his two-hour recreation period in the dayroom. (N.T. 8/17/93, 13–19; 8/18/93, 21–23).

29. Notwithstanding Assistant Warden Algarin's recommendation that Mr. Sanders be escorted by both a supervisor and a correctional officer whenever he left his cell, Officer Davenport followed Lt. Rizzutto's orders and opened Brian Sanders' cell door thereby permitting him to enter K–4's dayroom unescorted. (N.T. 8/18/93, 99–100).

30. At approximately 1:07 p.m., the plaintiff got off the telephone and resumed his legal work. Some twenty minutes later, another medium maximum security inmate, Troy Wallace, left the yard to return to the section. Upon his return, Officer Davenport advised Schwartz and Wallace that they would have to lock up in their cells, but Mr. Schwartz and Mr. Wallace apparently sat

down at the table in the dayroom and began watching television with Mr. Sanders instead. (N.T. 8/16/93, 94–96; 8/17/93, 20–22; Exhibit P–45).

31. When it became apparent to Officer Davenport that Mr. Schwartz and Mr. Wallace were not going to their cells, he called down to Officer Sowa at Post 32 and asked that he come up and lock up the two medium maximum security prisoners. Once done, Officer Davenport turned his attention to an inmate who was on the telephone in K–Pod, Section 6. Several minutes later, when he turned his attention back to K–4, he noticed that neither Sanders, Schwartz nor Wallace were in the dayroom. (N.T. 8/16/93, 94–95, 100–104; 8/17/93, 22–29).

32. The control booth in K–Pod is centrally located in such a way as to allow the guard on duty there to observe Sections 2, 4 and 6 of the pod. In addition, there is a TV monitor in the booth which enables the guard to observe Stairwell 6. There is generally only one guard on duty at a time in the control booth, which is kept locked at all times with the exception of those times when there is a shift change and when one guard is relieving another. The on-duty guard is able to open and lock cell doors by means of the electronic panel in the booth and can speak with and listen to prisoners in the pod by pressing the appropriate buttons for each section located in the electronic panel. (N.T. 8/16/93, 70–79; 8/17/93, 40–44).

33. While Mr. Schwartz, Mr. Wallace and Mr. Sanders were watching television in the dayroom, Mr. Sanders asked Mr. Schwartz if he would help him with some legal work. The two then walked into Mr. Sanders' cell and Mr. Sanders gave Mr. Schwartz a book to look at. Immediately after Mr. Schwartz looked down at the book, Mr. Sanders grabbed him by the neck, flipped him over the bed and onto the floor and began strangling him. Mr. Schwartz was unable to break free and was unable to scream for help. (N.T. 8/16/93, 4–6).

34. While Mr. Sanders was in the course of strangling Mr. Schwartz, Mr. Wallace entered Mr. Sanders' cell and asked Mr. Sanders whether he was sure he wanted to strangle Mr. Schwartz. At that point, Mr. Sand-

ers sufficiently loosened his hold on Mr. Schwartz' neck to enable him to break free and run into his own cell. (N.T. 8/16/93, 7–8).

35. Officer Davenport observed Mr. Schwartz run from Mr. Sanders' cell into his own cell and slam the door shut. Officer Davenport immediately locked Mr. Sanders' cell door and then called Mr. Schwartz out into the sallyport area. (N.T. 8/16/93, 8, 86, 109–110).

36. Although Mr. Schwartz initially refused to leave his cell and go out into the sallyport, he eventually obeyed Officer Davenport and went out to speak with him. At that time, Mr. Schwartz was crying and shaking uncontrollably and Officer Davenport observed a small nick or cut on top of his forehead. Nevertheless, Mr. Schwartz denied that anything was wrong. (N.T. 8/16/93, 9–10, 109–112).

37. At that point, Officer Sowa entered K–Pod Section 4 in response to Officer Davenport's earlier call and Officer Davenport escorted Mr. Schwartz to Lt. Rizzutto's office where Mr. Schwartz eventually related that he had been attacked and strangled by Brian Sanders. From there, Mr. Schwartz was taken to the medical department. (N.T. 8/16/93, 10–11, 110–113).

38. Steven Schwartz sustained abrasions to his neck, knee, chin, and below his eyes, bloodshot eyes, a severely sore throat and headaches as a result of having been attacked by Brian Sanders. His abrasions were cleaned by Elizabeth Belk, the Licensed Practical Nurse on duty, he was examined by Dr. Sciubba and was cleared to return to his cell. (N.T. 8/16/93, 12; 8/18/93, 26–28; Exhibits D–8, D–9, D–10).

39. MCCF officials have recognized that Mr. Sanders should not have been allowed to remain in the dayroom unescorted and unaccompanied by an officer and a supervisor in the company of Mr. Schwartz and Mr. Wallace. Notwithstanding this acknowledgement and despite the fact that Mr. Schwartz filed a complaint against Mr. Sanders, MCCF officials did not initiate or undertake an investigation into how or why the three inmates were permitted to co-mingle in the

dayroom on July 24, 1990. (N.T. 8/16/93, 15–16; 8/17/93, 103–104, 119–121; 8/18/93, 24–25, 99–100; Exhibit P–35).

40. A short while after Mr. Schwartz was taken to the medical department, Mr. Sanders was placed in four point restraints and was removed from his cell to the custody of the Montgomery County Sheriff's Department for transportation out of the Montgomery County Correctional Facility. (Exhibits D–16, P–37, P–38, P–40).

41. Shortly after his return to the Federal Correctional Institution in Raybrook, New York, on July 26, 1990, Steven Schwartz developed a very sore throat, fever and blotchy skin condition which the medical staff at Raybrook was unable to diagnose. In addition, because word of his having been attacked by Sanders had somehow been received by some of the other inmates with whom he was imprisoned at Raybrook, Mr. Schwartz was subjected to some verbal accusations concerning his sexual preferences and was attacked on one occasion by an inmate who thought he had been raped by Sanders. (N.T. 8/16/93, 16–18).

### DISCUSSION

■ The case at bar has as its very foundation the defendant's alleged violation of the plaintiff's constitutional rights under the eighth and fourteenth amendments to the United States Constitution and his right to sue therefor under 42 U.S.C. § 1983.[1] The Supreme Court has set forth the two essential elements of a § 1983 action generally: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3rd Cir.1993) citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), overruled in part on other grounds by *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). *See Also: Colburn v. Upper Darby Township*, 838 F.2d 663, 667–668 (3rd Cir. 1988). Inasmuch as the defendants have admitted in paragraphs 4, 5, 6 and 7 of their answer to the plaintiff's complaint: (1) that the defendant Montgomery County is a political subdivision of the Commonwealth of Pennsylvania governed by the Montgomery County Board of Commissioners, (2) that the Board of Prison Inspectors is the Correctional Facility's governing body and (3) that Warden Roth was at all times relevant to this action employed by and acting on behalf of Montgomery County, it is obvious that the complained-of conduct in this case was undertaken under color of state law. It is therefore incumbent upon this Court to ascertain whether that conduct deprived Mr. Schwartz of any of his constitutionally protected rights, privileges or immunities.

■ It is well settled that under the fourteenth amendment, a state may not authorize the deprivation of a protected liberty or property interest without providing a procedure in connection with that deprivation that meets the requirements of due process. *Sample v. Diecks*, 885 F.2d 1099, 1114 (3rd Cir.1989) citing, *inter alia, Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). A plaintiff who brings a § 1983 suit based on a violation of the due process clause must therefore allege and prove five things: (1) that he was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected the plaintiff or caused the plaintiff to be subjected to, this deprivation without due process; (4) that the defendant was acting under color of state law; and (5) that the plaintiff suffered injury

---

1. The eighth amendment, of course, affords U.S. citizens and resident aliens protection from excessive bail, fines and cruel and unusual punishment. The fourteenth amendment, in turn, prohibits, *inter alia,* the abridgement of the privileges and immunities, and equal protection of the law and the deprivation of life, liberty or property without legal due process. Section 1983 renders liable anyone who, while acting under color of state or territorial law, abridges or deprives any person within the jurisdiction of the United States of any of their constitutional rights, privileges or immunities.

as a result of the deprivation without due process. *Id.,* at 1113.

■ Although a municipality of governmental entity generally cannot be held liable under § 1983 on a *respondeat superior* theory or solely because it employs a tortfeasor, liability can attach against such an entity for someone else's constitutional tort where the entity itself "caused" the plaintiff to be subjected to the constitutional violation. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Stated otherwise, municipal liability attaches only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the inquiry." *Id.,* at 694, 98 S.Ct. at 2037–2038; *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3rd Cir.1990). *See Also: Hafer v. Melo,* — U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (A suit against a state official in her official capacity should be treated as a suit against the State.)

■ A government policy or custom, in turn, can be established in two ways. For one, policy may be made when a "decision-maker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy or edict. *Pembaur v. Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). A course of conduct is considered to be a "custom" when, though not authorized by law, such practices of state officials [are] so permanent and well settled as to virtually constitute law. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3rd Cir.1990). In either of these cases, a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well established custom. *Bielevicz v. Dubinon, supra,* at 850; *Andrews v. City of Philadelphia, supra,* at 1480 both citing *Jett v. Dallas Independent School District,* 491 U.S. 701, 736, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989).

■ It is equally well established that the eighth amendment affords an inmate a right to be protected from violence and physical harm inflicted by other inmates. *Young v. Quinlan,* 960 F.2d 351, 361 (3rd Cir.1992); *Riley v. Jeffes,* 777 F.2d 143, 147 (3rd Cir. 1985). To make out such an eighth amendment claim, an inmate must prove both an objective element—that the deprivation was sufficiently serious and a subjective element—that a prison official acted with a sufficiently culpable state of mind. Where the alleged eighth amendment violation concerns a prisoner's conditions of confinement or protection provided him against other inmates, the requisite state of mind is that of deliberate indifference. *Wilson v. Seiter,* 501 U.S. 294, ——, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991); *Young v. Quinlan, supra,* at 360.[2] Under *Young,* it is the law of the Third Circuit that a prison official is deliberately indifferent when he knows or should have known[3] of a sufficiently serious danger to an inmate. 960 F.2d at 360–361.

■ The objective component of an eighth amendment claim, on the other hand, is contextual and responsive to contemporary standards of decency. There is thus no requirement that a plaintiff sustain some arbitrary quantity of injury in order to maintain a suit for relief. *Hudson v. McMillian,* — U.S.

---

2. According to footnote 22 to the Third Circuit's decision in *Young,* "deliberate indifference" has been variously described as: (1) the possession of "actual knowledge of impending harm, easily preventable so that a conscious, culpable refusal to prevent harm could be inferred from a failure to prevent it;" (2) the "infliction of unnecessary suffering;" (3) the "unnecessary and wanton infliction of pain;" and, (4) the "knowledge of a pervasive risk of harm to inmates from other prisoners" and the failure to respond reasonably to the risk ... (citations omitted)

3. The *Young* court went on to further define what it meant by the phrase "should have known" by observing that "it connotes something more than a negligent failure to appreciate the risk ... though something less than subjective appreciation of that risk. The strong likelihood of harm must be so obvious that a lay person would easily recognize the necessity for preventative action; the risk of ... injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." 960 F.2d at 361. (citations omitted)

——, ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) citing *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

Accordingly, a § 1983 cause of action will therefore not lie under either the eighth or the fourteenth amendments where a government official is merely negligent in causing the injury. *See: Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 333–334, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986).

Applying all of the preceding legal principles to the case at bar, we note that the essence of plaintiff's complaint is that the defendants violated his constitutional rights to due process of law and to be free from cruel and unusual punishment by failing to keep Brian Sanders, whom they knew to be extremely dangerous and violent, segregated at all times from any and all other prisoners. Insofar as the due process claims are concerned, we have no difficulty finding that Mr. Schwartz has proven (1) that there was an infringement of his right to be free from cruel and unusual punishment; (2) that that deprivation occurred without due process of law; (3) that the defendants were acting under color of state law at all times relevant to these proceedings and (4) that he was injured, all as a result of the attack by Brian Sanders. Similarly, with respect to his eighth amendment claim, the evidence presented at trial supports a finding that Mr. Sanders' attack and attempted strangulation of Mr. Schwartz constitutes a serious deprivation of his right to be free from cruel and unusual punishment and his right to be protected from the violent acts of other inmates. These findings notwithstanding, it is somewhat more problematic for this Court to find that these defendants possessed the sufficiently culpable state of mind that is the prerequisite to finding that they caused the plaintiff to be subjected to a deprivation of his constitutionally-protected rights.

To be sure, the record clearly evinces that the defendants knew that Brian Sanders had a long history of violent, anti-social and sociopathic behavior both within their prison facility and other state and county facilities and that he posed a serious danger to the staff, other inmates and the security of their institution. The evidence further demonstrates, however, that as a result of this knowledge, the defendants not only classified Mr. Sanders a maximum security inmate who was locked down 22 out of every 24 hours, but also imposed additional restrictions on him such that he was *supposed* to have only been permitted to recreate alone under the supervision of a prison supervisor and a correctional officer and was *supposed* to have been accompanied by a supervisor and an officer anytime he left his cell.

Unfortunately for Mr. Schwartz, however, Assistant Warden Algarin's instructions were either not properly communicated to or not properly followed by Lt. Rizzutto and Officer Davenport with the result that Mr. Sanders was released from his cell without the appropriate escorts while Mr. Schwartz was still in the unit. While it is obvious to this Court that the defendants breached the duty of care which they owed to ensure Mr. Schwartz' safety, we cannot find that their conduct rose beyond the level of negligence to that of deliberate indifference to either the risk of harm posed by Mr. Sanders or to Mr. Schwartz' safety and physical well-being. Likewise, although it is equally apparent to this Court that MCCF's recreation and classification policies and procedures are in need of clarification and improvement particularly in the manner by which they are communicated to the prison's personnel, we cannot find that the policies themselves are responsible for the harm suffered by Mr. Schwartz. Rather, it was the means by which those procedures and policies were followed (or not followed) which caused the complained of injuries. So saying, we are unable to enter an award in favor of the plaintiff on Counts I and II of his complaint.

Turning now to Count III of the complaint, which seeks damages from defendants for assault and battery, intentional infliction of emotional distress, outrageous conduct, negligence, gross negligence and invasion of privacy, we find that the plaintiff presented no evidence whatsoever that these defendants intentionally inflicted emotional

distress upon him, assaulted him, invaded his privacy or were guilty of outrageous conduct. Accordingly, judgment shall be entered in favor of the defense as to those common law claims as well.

■ The remainder of the claims in that count, however, sound in negligence, in response to which the defendants have asserted that they are immune from suit by virtue of the provisions of the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541, *et seq.*

42 Pa.C.S.A. § 8541 sets forth the general rule that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." Under 42 Pa.C.S.A. § 8501, a "local agency" is said to be "[a] government unit other than the Commonwealth government. The term includes an intermediate unit." Section 8542, in turn, delineates the exceptions to the general rule of governmental immunity and states the following in that regard:

(a) **Liability imposed.**—A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):

(1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and

(2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

(b) **Acts which may impose liability.**— The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

(1) *Vehicle liability.*—The operation of any motor vehicle in the possession or control of the local agency. As used in this paragraph, "motor vehicle" means any vehicle which is self-propelled and any attachment thereto, including vehicles operated by rail, through water or in the air.

(2) *Care, custody or control of personal property.*—The care, custody or control of personal property of others in the possession or control of the local agency. The only losses for which damages shall be recoverable under this paragraph are those property losses suffered with respect to the personal property in the possession or control of the local agency.

(3) *Real property.*—The care, custody or control of real property in the possession of the local agency, except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency. As used in this paragraph, "real property" shall not include:

(i) trees, traffic signs, lights and other traffic controls, street lights and street lighting systems;

(ii) facilities of steam, sewer, water, gas and electric systems owned by the local agency and located within rights-of-way;

(iii) streets; or

(iv) sidewalks.

(4) *Trees, traffic controls and street lighting.*—A dangerous condition of trees, traffic signs, lights or other traffic controls, street lights or street lighting systems under the care, custody or control of the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

(5) *Utility service facilities.*—A dangerous condition of the facilities of steam, sewer, water, gas or electric systems owned by the local agency and located within rights-of-way, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

(6) *Streets.*—

(i) A dangerous condition of streets owned by the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

(ii) A dangerous condition of streets owned or under the jurisdiction of Commonwealth agencies, if all of the following conditions are met:

(A) The local agency has entered into a written contract with a Commonwealth agency for the maintenance and repair by the local agency of such streets and the contract either:

(i) had not expired or been otherwise terminated prior to the occurrence of the injury;  or

(ii) if expired, contained a provision that expressly established local agency responsibility beyond the term of the contract for injuries arising out of the local agency's work.

(B) The injury and dangerous condition were directly caused by the negligent performance of its duties under such contract.

(C) The claimant must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

(7) *Sidewalks.*—A dangerous condition of sidewalks within the rights-of-way of streets owned by the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.  When a local agency is liable for damages under this paragraph by reason of its power and authority to require installation and repair of sidewalks under the care, custody and control of other persons, the local agency shall be secondarily liable only and such other person shall be primarily liable.

(8) *Care, custody or control of animals.*—The care, custody or control of animals in the possession or control of a local agency, including but not limited to police dogs and horses.  Damages shall not be recoverable under this paragraph on account of any injury caused by wild animals, including but not limited to bears and deer, except as otherwise provided by statute.

**(c) Limited definition.**—As used in this section the amount of time reasonably required to take protective measures, including inspections required by law, shall be determined with reference to the actual equipment, personnel and facilities available to the local agency and the competing demands therefor.

As is obvious from the foregoing, for a claim to come within an exception to Section 8541, a claimant must satisfy both parts of a two part test.  First, claimant must meet both Section 8542(a)(1) and (a)(2) of the Act.  Second, the claim must fall within one of the eight exceptions listed in Section 8542(b) of the Act.  *Cooper v. Merrill,* 736 F.Supp. 552, 569 (D.Del.1990);  *Kearney v. City of Phila-*

*delphia,* 150 Pa.Cmwlth. 517, 616 A.2d 72, 73 (1992). What's more, the exceptions are to be narrowly construed. *Laney v. City of Pittsburgh,* 663 F.Supp. 1097, 1099 (W.D.Pa. 1987); *Mascaro v. Youth Study Center,* 514 Pa. 351, 523 A.2d 1118, 1123 (1987).

At bar, although it is clear that the damages sought by plaintiff were caused by the defendants' negligence and would otherwise be recoverable under the common law of Pennsylvania, there is nothing on this record of this case from which this Court could find that the defendants' negligent acts fell within any of the eight enumerated exceptions to governmental immunity carved out by § 8542(b). For these reasons, we conclude that plaintiff also cannot recover damages under the negligence theories pleaded in Count III of his complaint.

In consideration of all of the foregoing, the following legal conclusions are now made.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the within action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

2. The defendants were all acting under color of state law within the meaning of 42 U.S.C. § 1983 at all times relevant to these proceedings.

3. The defendant Lawrence Roth was at all times relevant to these proceedings acting solely in his official capacity as Warden of the Montgomery County Correctional Facility and there was no evidence presented or any foundation upon which to hold him personally liable.

4. All of the defendants in this action, as well as Officer Daymond Davenport and Lieutenant John Rizutto were negligent in communicating and following the correctional facility's recreation and classification policies and procedures. This negligence resulted in the attack upon and attempted strangulation of Steven Schwartz by Brian Sanders.

5. The defendants' conduct in failing to properly communicate and ensure that the correctional facility's policies and procedures governing inmate classification and recreation were properly followed did not constitute deliberate indifference to Mr. Schwartz'

constitutional rights to due process of law and to be free from cruel and unusual punishment.

6. The negligent conduct complained-of in this action does not fall within any of the eight exceptions to governmental immunity delineated in the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541, *et seq.* and thus plaintiff is not entitled to recover any damages from the defendants for their common law negligence.

An appropriate order follows.

### ORDER

AND NOW, this 3rd day of February, 1994, it is hereby ORDERED that judgment in no amount is hereby entered on Plaintiff's Complaint in favor of the defendants Montgomery County, Montgomery County Board of Prison Inspectors and Lawrence Roth and against the plaintiff, Steven A. Schwartz.