915 F.2d 845
 Barbara BIELEVICZ
v.
Officer J. DUBINON, a police officer of the City of
Pittsburgh Badge No. 557, Officer Beck, a police officer of
the City of Pittsburgh, Badge No. 512 and City of
Pittsburgh, a second class city in the Commonwealth of Pennsylvania.
Robert D. TUMPA
v.
Officer J. DUBINON, a police officer of the City of
Pittsburgh, Badge No. 557, Officer Beck, a police officer of
the City of Pittsburgh, Badge No. 512, and City of
Pittsburgh, a second class city in the Commonwealth of Pennsylvania.
Appeal of Barbara BIELEVICZ and David Tumpa.
 No. 89-3239.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1989.
Decided Sept. 28, 1990.
 
 Timothy P. O'Brien (argued), Sikov and Love, P.A., Pittsburgh, Pa., for appellants.
 Steven H. Bowytz (argued), Bowytz & Bowytz, Bryan Campbell, Pittsburgh, Pa., for appellees Officer Dubinon and Officer Beck.
 Robert B. Smith (argued), Asst. City Sol., D.R. Pellegrini, City Sol., Pittsburgh, Pa., for appellee City of Pittsburgh.
 Before BECKER and STAPLETON, Circuit Judges, and KELLY, District Judge*.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 In the wee hours of the morning of December 23, 1984, plaintiffs Barbara Bielevicz and David Tumpa were arrested by Officers John Dubinon and Virginia Beck of the Pittsburgh Police Department on charges of public intoxication. They were jailed for several hours and then released with no formal charges ever having been made and without a hearing. Plaintiffs brought this civil rights action, pursuant to 42 U.S.C. Sec. 1983, against Dubinon and Beck and also against the City of Pittsburgh, alleging that their arrest was without probable cause and that it was pursuant to the unconstitutional policy and practice of the City of Pittsburgh of: (1) arresting people on pretextual charges of public drunkenness without any intention of prosecuting them; (2) locking them up for several hours; and (3) releasing them without making charges or holding a hearing.
 
 
 2
 The case first proceeded to a jury trial on the issue of the liability of Officers Dubinon and Beck. The jury returned a verdict in favor of the plaintiffs. In the next phase of the case, the jury heard plaintiffs' evidence against the City. However, at the close of plaintiffs' evidence, the district court granted a directed verdict for the City, concluding that the jury could not, as a matter of law, find any causal connection between the policies and procedures of the City and the illegal arrest carried out by the individual officers. In the final phase of the trifurcated proceeding, the jury assessed Bielevicz's damages in the case against Dubinon and Beck at $14,000 ($4,000 in compensatory damages and $10,000 in punitive damages) and Tumpa's damages at $12,000 ($2,000 in compensatory damages and $10,000 in punitive damages).
 
 
 3
 In the companion appeal, No. 89-3197, the judgments entered on the verdicts in favor of plaintiffs have been affirmed by judgment order. This opinion addresses the plaintiffs' appeal from the judgment entered on the directed verdict for the City. Plaintiffs argue that they presented evidence sufficient to withstand a motion for directed verdict on the question whether their injuries were caused by the City's practices concerning public intoxication arrests. We agree with the plaintiffs and will therefore reverse and remand to the district court for further proceedings.
 
 I. FACTS
 
 4
 The factual circumstances giving rise to this appeal, viewed in the light most favorable to the plaintiffs, see Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir.1987), are as follows. Tumpa is the owner of several pizza shops in the city of Pittsburgh. On the evening of December 22, 1984, and into the early hours of December 23, 1984, Tumpa was working at his Perrysville Street pizza shop. Shortly after midnight, he left the shop to visit a friend's bar across the street, where he consumed two alcoholic drinks within the course of his twenty-minute stay. Upon leaving the bar, he returned to the pizza shop to conduct closing procedures.
 
 
 5
 After closing the Perrysville Street shop, Tumpa took the day's cash receipts to his East Street shop, which was managed by Bielevicz. Bielevicz asked Tumpa to drive her home. He agreed to do so, but told her that he needed first to stop at Chez Kimberly's, a bar in downtown Pittsburgh owned by another of his friends, to pick up a gift. Upon arriving at Chez Kimberly, Tumpa entered the bar and consumed part of another alcoholic drink, while Bielevicz, who was carrying the cash receipts from the pizza shops and consequently considered the walk to the bar too dangerous, remained in the car.
 
 
 6
 Tumpa left Chez Kimberly at approximately five minutes before two, carrying with him the remainder of his drink, as well as the gift he had come to pick up--a bottle of champagne. Upon entering the car, he put the champagne on the floor in front of the back seat, placed the drink on the dashboard, and began driving. As the car turned onto Liberty Avenue, the drink fell, spilling onto the floor and Bielevicz. Shortly thereafter, Tumpa noticed flashing lights in his rear-view mirror and pulled the car to the side of the road.
 
 
 7
 Officers Beck and Dubinon, who claim to have stopped the vehicle for reckless driving, put Tumpa in the back of their police van and instructed Bielevicz, who had not consumed any alcohol, to follow them to the Public Safety Building in Tumpa's car.[1] After arriving at the Public Safety Building, Bielevicz waited for approximately one and one-half hours while Tumpa was subjected to an alcohol breathalyzer test. Beck and Dubinon insisted upon testing Tumpa notwithstanding the fact that he was not loud or boisterous--indeed he was cooperative--and did not exhibit any signs of inebriation. Dubinon then informed Tumpa that he had passed the breathalyzer test with a reading of .08. Tumpa was therefore free to leave, but he was strongly cautioned by Officer Beck that he was not to drive. Further, Beck, referring to Bielevicz, stated that if "that bitch" drives, she would be arrested also. Bielevicz, who had consumed no alcoholic beverages, also showed no signs of intoxication. Beck suggested that Tumpa and Bielevicz get something to eat or call a cab.
 
 
 8
 Tumpa, apprehensive about leaving his new car in downtown Pittsburgh at that hour, waited until Beck was out of earshot, and confided in Officer Dubinon that he wished neither to call a cab nor to walk the half-mile to the nearest restaurant while carrying significant amounts of cash. More importantly, he saw no reason to do so because both he and Bielevicz were competent to drive. Dubinon suggested that the plaintiffs "wait until we go around the block and go ahead and leave." Tumpa thanked Dubinon, waited until the officers left the building, and walked to the car, where Bielevicz got behind the wheel.
 
 
 9
 After warming up the engine for a few minutes and watching the police van pull out, Bielevicz began driving. At the first intersection, she made a left-hand turn, and was immediately pulled over, again by Dubinon and Beck. Dubinon opened the passenger door of the car where Tumpa was sitting and said "You really f----d up now." Tumpa and Bielevicz were both frisked and placed in the back of the police van. Dubinon drove Tumpa's car back to the Public Safety Building.
 
 
 10
 Upon arriving at the Public Safety Building, Tumpa and Bielevicz were led separately, by Dubinon and Beck respectively, to jail cells. Tumpa asked to make a telephone call, but was told he could make one "when he got out." As Beck locked Bielevicz's cell, she said to her "Merry Christmas, Honey." Approximately three hours later, the turnkeys released Tumpa and Bielevicz from their cells. Neither before nor after their detention were Tumpa or Bielevicz issued a citation or provided an opportunity to contest their arrest before a judicial authority.
 
 
 11
 Tumpa and Bielevicz later learned that the alleged basis for their incarceration was public intoxication. According to William Moore, the former Pittsburgh Chief of Police and a longtime veteran of the police force, it was common knowledge among officers that the charge of public drunkenness could be used to remove from the streets without probable cause a person who was not intoxicated. In particular, Moore stated that the charge was often used to defuse crowd control problems, to detain people found in areas of notorious drug use, to arrest women suspected of prostitution, and to punish anyone who defiantly quarreled with an officer. In these situations, suspects were arrested and incarcerated, notwithstanding that typically there was not probable cause to believe they were intoxicated.
 
 
 12
 Moore also described the procedure whereby the police routinely arrested people for public intoxication with no intention of prosecuting them. The decision whether to arrest and incarcerate an individual using the charge of public drunkenness was left entirely to the discretion of the arresting officer. If so incarcerated, the person--pursuant to an unwritten policy known as the "four-hour rule"--remained in lockup in the Public Safety Building for a period not exceeding four hours. Upon the termination of this period, the individual was released by the turnkey without a citation or a hearing. At no point in this process was the individual's intoxication confirmed by another officer or a judicial authority; rather, the arresting officer's judgment remained insulated from all external checks. In spite of Moore's knowledge of the details of this suspect procedure, he did nothing to correct it.
 
 
 13
 Not only were no safeguards implemented to prevent illegal arrests for public drunkenness, but the City also followed an express policy of not investigating--or even accepting--complaints regarding alleged pretextual arrests under the charge. All citizen complaints of police misconduct in Pittsburgh, regardless of where they originated, were referred to the Office of Professional Responsibility. Sergeant James Hayes, the director of the Office, testified that reports of illegal public intoxication arrests were the only category of complaints that his Office did not accept.
 
 
 14
 Under the procedural posture of this case, the time had not yet come for the City to introduce evidence. However, in argument, the City has challenged the relevance to this case of the policy of the Office of Professional Responsibility by emphasizing that the two officers who arrested plaintiffs did not know that the department did not accept complaints involving public intoxication arrests.
 
 II. DISCUSSION
 A. Standard of Review
 
 15
 Review of a directed verdict is plenary. Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir.1987). In conducting our review, we must utilize "the same standard initially applied by the district court." Walmsley v. City of Philadelphia, 872 F.2d 546, 551 (3d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989). When deciding a motion for directed verdict under Fed.R.Civ.P. 50(a), the district court must "consider the evidence in the light most favorable to the nonmoving party, and deny a defendant's motion 'if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability.' " Id. (citation omitted). A directed verdict should be granted only if "there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." Macleary, 817 F.2d at 1083 (citations omitted). Our task is to review the record and ascertain whether the district court was correct in concluding that, as a matter of law, there is insufficient evidence from which a jury could find the City liable to the plaintiffs under Sec. 1983.
 
 B. Municipal Liability Under Sec. 1983
 
 16
 In determining whether a government entity may be held liable under 42 U.S.C. Sec. 1983, we are guided by the rule, announced in Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that liability may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights. Id. at 691-95, 98 S.Ct. at 2036-38. Thus, municipal liability attaches only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694, 98 S.Ct. at 2037-38.
 
 
 17
 Meeting the task of proving a government policy or custom has been approached in different ways. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986)). Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law. Andrews, 895 F.2d at 1480; see also Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), cert. denied, --- U.S. ----, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989).
 
 
 18
 In either instance, a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom. Andrews, 895 F.2d at 1480. This requirement stems from the Supreme Court's mandate in Jett v. Dallas Independent School District, --- U.S. ----, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), that:
 
 
 19
 [I]t is for the jury to determine whether their [policymakers'] decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur ... or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity.
 
 
 20
 Id. 109 S.Ct. at 2723 (emphasis in original) (citation omitted). In order to identify who has policymaking responsibility, "a court must determine which official has final, unreviewable discretion to make a decision or take an action." Andrews, 895 F.2d at 1481. Under Sec. 1983, only the conduct of those officials whose decisions constrain the discretion of subordinates constitutes the acts of the municipality. Cf. City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiff's evidence. Practices " 'so permanent and well settled' as to have 'the force of law' [are] ascribable to municipal decisionmakers." Anela v. City of Wildwood, 790 F.2d 1063, 1067 (3d Cir.1986) (quoting Monell, 436 U.S. at 691, 98 S.Ct. at 2036).
 
 
 21
 However, proof of the mere existence of an unlawful policy or custom is not enough to maintain a Sec. 1983 action. A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered. Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir.1984). To establish the necessary causation, a plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the municipality's custom and the specific deprivation of constitutional rights at issue. See Estate of Bailey by Oare v. County of York, 768 F.2d 503, 507 (3d Cir.1985) (there must be a "plausible nexus between the policy ... and the infringement of constitutional rights");[2] City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) ("there must be an affirmative link between the policy and the particular constitutional violation alleged"). As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury. See Black v. Stephens, 662 F.2d 181, 190-91 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982).
 
 
 22
 Contrary to the City's assertions, the plaintiffs need not demonstrate that their injuries were the direct result of formal departmental procedures or encouragement in order to satisfy the nexus requirement. Therefore, the fact that the City did not have an express policy authorizing officers to make public intoxication arrests without probable cause does not relieve the City of liability. Instead, to sustain a Sec. 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation--i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury. If the City is shown to have tolerated known misconduct by police officers, the issue whether the City's inaction contributed to the individual officers' decision to arrest the plaintiffs unlawfully in this instance is a question of fact for the jury. The Fourth Circuit, in Spell v. McDaniel, 824 F.2d 1380 (4th Cir.1987), cert. denied sub nom. City of Fayetteville v. Spell, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988), clearly articulated this theory of proximate causation: "A sufficiently close causal link between ... a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." 824 F.2d at 1391. We endorse this formulation.
 
 
 23
 Furthermore, in Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989), we held that a municipality's failure to act, once it was on notice that its procedures were constitutionally deficient, created a fact question respecting causation. The plaintiff in Colburn sued the township under Sec. 1983 claiming that the township's "custom of laxity" in supervising jail cells and in searching individuals taken into custody was the proximate cause of a detainee's suicide. Plaintiff further asserted that, because the decedent was the third individual in recent years to commit suicide while in police custody, the township was on notice of the inadequacy of its detention procedures. Relying on the township's inaction in the face of two prior suicides, we held that the nexus between the township's custom and the particular constitutional violation alleged was not "so implausible that the complaint cannot be maintained." 838 F.2d at 672.
 
 
 24
 Indeed, it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future. The Supreme Court in Brandon v. Holt 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985), endorsed this proposition. The plaintiffs, in Brandon, alleged that they were attacked by a police officer whose dangerous propensities were well-known within the officer's precinct. The existence of deficient department procedures for discovering officer misconduct, however, prevented the police chief from learning of the officer's past violent behavior. The Supreme Court upheld a judgment against the municipality under Sec. 1983, implying that the police department's defective policies could have contributed to the officer's assault of plaintiffs. See id. at 467, 105 S.Ct. at 875.
 
 
 25
 Plaintiffs here maintain that the City knew that people were being arrested for public intoxication without probable cause yet did not remedy the problem. Plaintiffs further contend that the City's permitted continuation of this custom made their unlawful arrest "reasonably probable," Spell, 824 F.2d at 1391. Evidence tending to establish such a custom and causal connection will be sufficient to enable plaintiffs to avoid a directed verdict.
 
 
 26
 C. The Custom of the Pittsburgh Police Department With Respect to Public Drunkenness Arrests--Was the Evidence Sufficient?
 
 
 27
 The testimony of Chief Moore, a station commander in 1984, is critical to plaintiffs' case. At trial, Moore described customary police conduct in making public intoxication arrests. He testified that everyone in the police department generally understood that the charge of public intoxication could be used to arrest someone for reasons other than intoxication and hence without probable cause to believe that they were intoxicated. Moore also maintained that it was common knowledge among police officers that the charge could be used with impunity to remove someone from the street whose responses or attitude infuriated the officer. He further stated that the discretion to confine the person in the Public Safety Building belonged exclusively to the arresting officer. If incarcerated for public intoxication, the individual was detained for a period of up to four hours and then released. At no time prior to confinement or subsequent to release did anyone other than the arresting officer evaluate the condition of the allegedly intoxicated person.
 
 
 28
 Finally, Moore's testimony reflects that he acquiesced in the continuation of this custom during his tenure as station commander and police chief. He stated that, although the procedure used to incarcerate individuals on the charge of public intoxication was of concern to him and was on his agenda of abuses requiring attention, he did not have an opportunity to address this practice because the police department was undergoing a reorganization at the time. Therefore, to the best of Moore's knowledge, police officers continued to make arrests for public intoxication without probable cause throughout the period relevant to this case.
 
 
 29
 Moore's account of common police practice is consistent with the testimony of Officer Dubinon. Dubinon stated that when he arrested and incarcerated Tumpa and Bielevicz for public intoxication, he did not intend to prosecute them for this charge and knew that there would not be a hearing. In fact, Dubinon had made countless such arrests in the past and had not once appeared at a hearing. Dubinon further conceded that it was his understanding, from his experience as a police officer, that anyone arrested for public intoxication was incarcerated in the Public Safety Building for a maximum of four hours. As a general practice, the individual was then simply released, and the charge of public intoxication was never pursued.
 
 
 30
 Ralph Pampena, chief of police since June, 1987, similarly described police custom. Pampena stated that when someone was placed in lock-up for public intoxication, the arresting officer was the only person to review that individual's condition beforehand. Pampena also acknowledged that, in his thirty-one years as a police officer, he had made numerous arrests for public intoxication and, like Dubinon, had never appeared at a hearing on that charge.
 
 
 31
 The parties debate the importance of the police department's policy of not accepting complaints regarding unlawful public intoxication arrests. The City insists that this policy is irrelevant because neither Dubinon nor Beck was aware of it. We are not persuaded by this argument. Regardless of the individual officers' knowledge, the existence of this policy is evidence that the City ignored complaints about an abuse that was reputedly widespread. This possibility further supports plaintiffs' claim that the police department's existing procedures were inadequate to address a known problem.
 
 
 32
 In our view, the foregoing testimony constitutes sufficient evidence to support a jury inference that there was a long-established custom in the Pittsburgh police department of arresting and detaining people on charges of public intoxication without probable cause and with no intention of prosecuting them or of holding a hearing. Such well-established custom exists only with the approval or, at the very least, with the sufferance of policymakers.
 
 D. Proximate Causation
 
 33
 We also find that there is sufficient evidence of an affirmative link between the custom of the police department and the unlawful arrest of plaintiffs. First, the fact that there is scant evidence of plaintiffs' intoxication and abundant evidence of the individual officers' animosity toward plaintiffs raises serious questions whether plaintiffs were really arrested because of public drunkenness. More importantly, on this record, a fact finder could conclude that Dubinon and Beck, emboldened by the City's laxity regarding public intoxication arrests and somehow antagonized by their exchange with Bielevicz and Tumpa, incarcerated the plaintiffs out of malice, using the proffered charge as a pretext.
 
 
 34
 To begin, we note again that there is evidence that Dubinon, and probably Beck, knew of the general practice in the police department of arresting people for public intoxication without probable cause or intent to prosecute. Dubinon testified that he was aware that people arrested for public intoxication were incarcerated without a hearing and typically released after a few hours. According to Dubinon's understanding of the department procedures, an officer, with virtual impunity, could detain a person, using the public intoxication charge as a pretext, for reasons other than intoxication. The record supports plaintiffs' contention that Dubinon and Beck did just that.
 
 
 35
 Indeed, the jury, in plaintiffs' action against the individual officers, found that the arrest of Bielevicz and Tumpa was not supported by probable cause but was instead motivated by ill will. That the jury awarded plaintiffs punitive damages demonstrates that it also found that Dubinon and Beck acted outrageously in making the arrest. The record corroborates this finding, containing significant evidence that Bielevicz and Tumpa were not publicly drunk as defined by the statute.[3]
 
 
 36
 First, Tumpa, who was subjected to and passed an alcohol breathalyzer test moments before his arrest, could not, under the circumstances, have been incapacitated to the degree required by the statute. Second, there appears to be little cause to question Bielevicz's sobriety. When Bielevicz and Tumpa were stopped for the first time, Dubinon and Beck had sufficient confidence in Bielevicz's condition that they instructed her to drive Tumpa's car back to the police station. And after the second stop, the officers did not see fit to administer a field sobriety test to assess more accurately whether Bielevicz was inebriated. The only evidence that Bielevicz had been drinking--the odor of alcohol--is explained by Bielevicz's claim that an alcoholic drink had been spilled on her. Third, Bielevicz and Tumpa were detained in the police station for the hour and one-half immediately preceding their arrest, during which time they obviously had nothing to drink and, according to the evidence, were neither boisterous nor visibly intoxicated.
 
 
 37
 In short, the facts would enable a jury to draw an inference that Bielevicz and Tumpa were arrested and incarcerated not because of alcohol, but because of personal animus. Scattered throughout the record are indications that the relationship between the officers and the plaintiffs at some point degenerated to a less than cordial state. On two occasions, for example, the officers used profanity in addressing Bielevicz and Tumpa. But perhaps most probative of the officers' hostility toward plaintiffs was Beck's "Merry Christmas" remark when she locked Bielevicz in her jail cell.
 
 
 38
 In fact, a jury could find all of the circumstances surrounding the second stop of Tumpa's car, which resulted in plaintiffs' arrest, somewhat suspect. The officers, in their testimony, insisted that they did not initially recognize Tumpa's car when they pulled it over. Considering the officers' previous opportunity to observe the car and their training as police officers, we believe that a jury could find this claim unconvincing to say the least. In addition, that the officers did not issue a citation to plaintiffs for running a red light, the alleged basis for the stop, also calls into question the officers' true rationale for stopping the car.
 
 
 39
 The City suggests that because Dubinon and Beck acted with personal ill will, it is somehow immunized from liability. But the City has not refuted the reasonable inference that the police department's custom of tolerating unlawful arrests for public intoxication affected the officers' decision to arrest plaintiffs unjustly in this instance. This possibility, which is sufficient to supply the plausible nexus required by Sec. 1983, should have been submitted for the jury's consideration.
 
 III. CONCLUSION
 
 40
 As we discussed earlier, a municipal custom may be established by proof that officials with policymaking responsibility knew of and acquiesced in an unlawful course of conduct. The record in this case contains facts from which a jury could reasonably infer that policymakers knew that the charge of public drunkenness was used to incarcerate individuals who were not intoxicated, yet failed to take affirmative steps to remedy this problem.
 
 
 41
 We also conclude that the district court incorrectly granted a directed verdict for the City on the basis of proximate causation. To prove causation under Sec. 1983, plaintiffs must establish an affirmative link or plausible nexus between the aforedescribed custom and their incarceration. A jury, if it believed the above evidence, could conclude that the officers' general understanding--i.e., that those arrested for public drunkenness were incarcerated for a few hours and then released without a hearing--influenced their decision to arrest plaintiffs without probable cause. In other words, knowing that their discretion was not subject to review might have induced Dubinon and Beck to incarcerate plaintiffs due to personal rancor, using the charge of public intoxication as a pretext. If a jury credited this scenario, and it could reasonably do so, the proximate causation requirement would be satisfied.
 
 
 42
 Since plaintiffs have put forth evidence from which a jury might infer both the existence of an unconstitutional custom and a plausible nexus between the custom and plaintiffs' injuries, we will reverse the district court's order granting the City's motion for a directed verdict and remand for further proceedings.
 
 
 
 *
 The Honorable Robert F. Kelly, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 This fact is disputed by the officers, who claim that Dubinon drove Tumpa's car back to the Public Safety Building
 
 
 [2]
 The Supreme Court, in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), overruled the specific holding of Bailey. In particular, the Court rejected the proposition that, once a State learns that a particular child is in danger of abuse from a third party and undertakes to protect the child, the Constitution imposes an affirmative duty upon the State to provide adequate protection for the child. 109 S.Ct. at 1002. Nonetheless, the "plausible nexus" standard of proximate causation set forth in Bailey remains the law in this Circuit
 
 
 [3]
 Under Pennsylvania law, a person is guilty of public drunkenness "if he appears in any public place manifestly under the influence of alcohol to the degree that he may endanger himself or other persons or property, or annoy persons in close proximity." 18 Pa.Cons.Stat.Ann. Sec. 5505 (Purdon 1983). Based upon a reasonable reading of this statute, it would appear that public drunkenness requires a higher degree of intoxication than drunk driving