

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-16-2007

# Watson v. Abington

Precedential or Non-Precedential: Precedential

Docket No. 05-4133

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Watson v. Abington" (2007). *2007 Decisions*. Paper 1543.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1543

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4133

———

ANTONIO D. WATSON; TONY TIX, INC.;
GERALD W. KELLY; JUST JERRY'S INC,
t/a and d/b/a Scoreboard Restaurant & Tavern;
ROBERT KENNEDY

v.

ABINGTON TOWNSHIP;
ABINGTON TOWNSHIP POLICE DEPARTMENT;
CHIEF WILLIAM J. KELLY, Individually and
in his Official capacity as a Police Chief,
Abington Township Police Department;
DETECTIVE RICHARD L. KONDON, Badge No. 1981,
Individually and in his Official Capacity as a Police Officer,
Abington Township Police Department;
DETECTIVE JOHN PARKS, Badge No. 0092,
Individually and in his Official capacity as a Police Officer,
Abington Township Police Department;
DETECTIVE ANTHONY AMMATURO, Badge No. 1556,
Individually and in his Official Capacity as a Police Officer,
Abington Township Police Department

Gerald W. Kelly, Just Jerry's Inc. t/a and d/b/a
Scoreboard Restaurant & Tavern,

Appellants

―――――

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 01-cv-05501)
District Judge:  Honorable Petrese B. Tucker

―――――

Argued September 12, 2006
Before:  FUENTES, FISHER and BRIGHT,[*] *Circuit Judges.*

(Filed:  February 16, 2007)

D. Louis Nicholson(Argued)
Two Penn Center Plaza, Suite 200
1500 JFK Boulevard
Philadelphia, PA  19102
        *Attorney for Appellants*

―――――

[*]The Honorable Myron H. Bright, United States Circuit
Judge for the Eighth Circuit, sitting by designation.

Walter F. Kawalec, III (Argued)
Marshall, Dennehey, Warner,
 Coleman & Goggin
200 Lake Drive East
Woodland Falls Corporate Park, Suite 300
Cherry Hill, NJ  08002

Joseph J. Santarone, Jr.
Marshall, Dennehey, Warner,
 Coleman & Goggin
620 Freedom Business Center, Suite 300
King of Prussia, PA  19406
        *Attorneys for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Gerald Kelly and his business Just Jerry's, Inc. (collectively "Plaintiffs") appeal from a decision of the United States District Court for the Eastern District of Pennsylvania dismissing their claims against Abington Township, the Abington Township Police Department, Police Chief William Kelly,[1] and three individual officers (collectively, "Defendants")

---

[1]Chief William Kelly – of no relation to Plaintiff Gerald Kelly – was Abington Township's police chief from 1986 through the time the events relevant to this case occurred.

3

under 42 U.S.C. § 1983. The District Court dismissed the Plaintiffs' Fourth Amendment claim under Federal Rule of Civil Procedure 12(b)(6) based on the closely regulated industry exception to the warrant requirement. It also granted summary judgment to the Defendants on the Plaintiffs' Fourteenth Amendment claim, based on a lack of evidence from which a jury could infer a municipal policy or custom of discriminating against African-Americans. For the reasons set forth below, we will vacate the District Court's dismissal of the Plaintiffs' Fourth Amendment claim, and affirm the Court's summary judgment ruling on the Plaintiffs' Fourteenth Amendment claim.

I.

Because this case comes to us on a motion to dismiss and a grant of summary judgment, we will view the facts in the light most favorable to the non-moving party, in this case the Plaintiffs.

In 1993, Gerald Kelly retired from the Abington Township Police Department as a lieutenant, after twenty-eight years on the force. Upon his retirement, Kelly purchased the Scoreboard Restaurant and Tavern ("Scoreboard"), and set it up under the corporate entity Just Jerry's, Inc. Kelly and his wife also purchased the property on which the restaurant was located, but did so under their own names.

On August 10, 1998, Kelly leased a storefront adjacent to the Scoreboard to Antonio Watson, an African-American who was an original plaintiff in this case.[2] Watson used the property to operate a ticket agency named Tony Tix, Inc. Tony Tix

---

[2]Watson died on December 25, 2004.

4

remained open from October 1998 to February 2000, and was reportedly very successful during this time.

Shortly after Tony Tix opened, Lieutenants Peter Hasson and George Magalish of the Abington Township Police Department reportedly spoke to Kelly about Watson.[3] They asked about his background and his business. During their discussion, Kelly mentioned his plans to sell the Scoreboard to Watson. Kelly testified that upon learning of these plans, Lt. Hasson allegedly said "[w]e heard you're . . . selling the bar to [Watson]. And [Kelly] said, [w]ell, you won't be mad when I sell it to a black guy. [Hasson] said, [w]ell, we can raid you out of business and you can buy it back cheap and then he just laughed."

The Plaintiffs argue that, although Kelly never sold the bar to Watson, the police did precisely what Lt. Hasson suggested they would do: raid him out of business based on his association with Watson. On May 20, 1999; December 18, 1999; August 3, 2000; and November 25, 2000, the Abington

---

[3]The Defendants dispute this account, claiming that they had no knowledge of Watson before May 10, 1999, when he was involved in a shooting near his residence. They also claim to have received numerous complaints about Watson's business dealings, which led to an investigation in 2000. For the purposes of this matter, however, we are required to view the record in the light most favorable to the Plaintiffs. In particular, when considering the Fourth Amendment claim dismissed pursuant to Fed. R. Civ. P. 12(b)(6), we must accept the Plaintiffs' allegations as true. *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000).

Township Police Department conducted sweeps of the Scoreboard. During these raids, between five and fifteen uniformed officers would enter the bar. One officer would secure the door, while others would walk around and check the identification of the bar's patrons. The officer at the door prevented anyone from entering or leaving until the sweep was complete.

On the dates that the officers searched the Scoreboard, other bars were also swept. For example, on May 20, 1999, officers also swept the McKinley Tavern, Hollywood Tavern, Union Jacks Old Glory Pub, and Keswick Tavern. The Defendants claim that the sweeps began in 1999, and were funded by grants provided by the Commonwealth of Pennsylvania. However, Lt. Hasson testified that on May 20, 1999, no one from either the Liquor Control Board or the enforcement bureau accompanied the officers in their search of the Scoreboard. According to his testimony, an agent from the enforcement bureau did accompany the officers during the December 18 and August 3 sweeps. Nothing in the record confirms this claim.

The Plaintiffs also claim that, beginning in 1998, the Defendants would often station a marked police vehicle in the parking lot directly across the street from the Scoreboard. On one occasion in either 1998 or 1999, the Defendants set up a Driving Under the Influence ("DUI") checkpoint directly in front of the Scoreboard. During this checkpoint, floodlights illuminated the bar.

The Plaintiffs presented sworn affidavits from several individuals who were familiar with the Abington Township Police Department's activities at the Scoreboard. Eugene

Chapman, an African-American, was a frequent patron of the Scoreboard, who lived behind the establishment. According to his affidavit, he was followed on several occasions for no legitimate reason by Township police when he drove from behind the Scoreboard. He has been stopped seven times by the Department, but has never received a ticket or citation. Chapman also stated that he was present for a raid of the Scoreboard, during which the officers made all of the customers lie on the floor. In addition, he saw the Department set up highly visible DUI checkpoints very close to the Scoreboard every other weekend. In 2003, he was harassed while parked in a public park by officers who said they had a call that "a strange man was in his car in the park watching television."

James Barry, a floor manager for the Scoreboard, also submitted an affidavit. He claimed to have been present on at least seven occasions when Abington Township police raided the establishment. One week, they raided the bar two nights in a row. According to him, no other bars were being raided in this manner. During these raids, African-American customers were harassed more than Caucasian customers. Officers were also stopping Scoreboard patrons for no apparent legitimate reason after they left the bar. This happened to African-American customers more frequently than to Caucasian patrons. In addition, a marked police car was parked across the street from the Scoreboard every night, and this car was visible to customers. According to Barry, these actions destroyed the Scoreboard's business.

Robert Kennedy, an employee of the Scoreboard, submitted an affidavit claiming that he observed a uniformed, African-American female officer harass a black customer. On

one occasion, Kennedy witnessed the Department set up a DUI checkpoint immediately outside the Scoreboard's parking lot.

The Plaintiffs also presented Kelly's deposition testimony in order to provide an inside view of the Abington Township Police Department. Based on his twenty-eight years with the Department, he testified that it was "common knowledge" that racial profiling in traffic stops was an easy way for an officer to increase the number of traffic tickets he issued. Kelly himself had racially profiled cars leaving Philadelphia as a way to get quick tickets.

According to Kelly, there was a high number of profiling car stops of African-Americans coming out of Philadelphia, and African-Americans were stopped more often than Caucasians. He also alleged that the police department applied a different standard to African-Americans and other minorities than it applied to Caucasians. Kelly believed that the racial profiling occurred on a weekly basis, and that it was still occurring when he retired in 1993.

In addition to the profiling, Kelly testified that he heard a number of racial slurs during his twenty-eight years at the Department. He claims to have heard them approximately on a monthly basis. Detective Richard Kondon, a defendant in this case, testified that he also heard racial epithets while at work, but did not discuss their frequency.

Kelly also testified that he did not know of anyone ever being reprimanded for making racial slurs. However, Chief Kelly testified that he personally heard only two racial epithets uttered by Township officers during his eighteen years as chief, and that he punished the offending officer both times. One slur

was directed at African-Americans, and the other at Jews. Both of the officers who used these slurs were suspended.

According to Kelly, most of the Department knew about the racial profiling, and Chief Kelly "should have known." When asked if Chief Kelly knew about the racial profiling and racial slurs, Kelly answered, "[y]es, I would say. Unless you're totally absent from there, you have to hear something." When asked if Chief Kelly was totally absent, Kelly replied "I don't believe so." However, when Kelly was asked if Chief Kelly was aware of officers uttering racial slurs, Kelly replied "Well, I assume at some point during [his] career [he] might [have] hear[d] a slur, yeah. That is an assumption. I can't say I have proof of anything."

On October 30, 2001, the Plaintiffs filed suit against Abington Township, the Abington Township Police Department, Chief William Kelly, and three individual officers. Among other claims that have been dismissed and are not relevant to this appeal, the Plaintiffs brought claims under 42 U.S.C. § 1983 for violation of their Fourth and Fourteenth Amendment rights. In response, the Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). On February 20, 2002, the District Court granted the Defendants' motion to dismiss as to the Plaintiffs' Fourth Amendment claim. The Court determined that the Plaintiffs had not made any allegations upon which relief could be granted because all they had claimed was that the bar was searched without a warrant. The Court reasoned that no warrant was necessary to comply with the Fourth Amendment because the sale of liquor is a closely regulated industry. The Plaintiffs filed

a motion for reconsideration, which was denied by the District Court on March 31, 2003.

On September 30, 2004, the Defendants filed a motion for summary judgment, requesting that all of the Plaintiffs' remaining claims be dismissed. The District Court granted this motion on August 5, 2005. As to the Plaintiffs' Fourteenth Amendment claim, the Court determined that there was insufficient evidence of a municipal policy or custom of racial discrimination to survive summary judgment. The Plaintiffs now appeal from both the order dismissing their Fourth Amendment claim and the grant of summary judgment on their Fourteenth Amendment claim. We exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

II.

A.

The Plaintiffs' first argument is that the District Court erred in dismissing their Fourth Amendment claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. We exercise plenary review over such matters. *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000).

In determining whether the District Court erred in dismissing the Plaintiffs' claim under 12(b)(6), "[w]e must determine whether, under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief, and we must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Id.* (quoting *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996)) (internal quotation marks omitted). At this stage of the proceedings, "[t]he complaint will be deemed to have alleged

sufficient facts if it adequately puts the defendants on notice of the essential elements of the plaintiffs' cause of action." *Id.* Finally, "[i]n considering a 12(b)(6) motion, we do not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims. Thus, the district court's order granting the defendants' motion to dismiss will be affirmed only if it appears that the plaintiffs could prove no set of facts that would entitle them to relief." *Id.*

Here, the District Court determined that the Plaintiffs had not made any allegations upon which relief could be granted because all they had claimed was that Abington Township police had searched the Scoreboard without a warrant.[4] The

---

[4]Here, the Plaintiffs' complaint alleged the following in relation to their Fourth Amendment claim:

> 54. As a result of the Plaintiffs Gerald W. Kelly and Scoreboard's social and professional association with Plaintiff Watson, an African-American, Defendants . . . through their agents, servants, and/or employees, prior to February 10, 2000, commenced a systematic practice of sending 15 to 20 uniformed Abington Township police officers, in marked cars and without a warrant, into the Scoreboard Restaurant and Tavern allegedly for the purpose of investigation [sic] underage drinking.

11

Scoreboard was engaged in the sale of liquor, which is a closely

55. During these police raids, as described in above paragraph 54, the police officers would not allow anyone to either enter or leave the Scoreboard Restaurant & Tavern.

56. During the police raids as described in above paragraph 54, the police officers would surround the Scoreboard Restaurant & Tavern in marked police cars with their flashing lights operating.

57. The practice of sending in several uniformed police officers into the Scoreboard Restaurant without a warrant . . . was an illegal and unjustified seizure.

. . . .

101. In the manner, described . . . all Defendants deprived Plaintiffs of their rights to be [sic] equal protection of the law, freedom from unlawful search and seizure, freedom from intentional infliction of emotional distress and to due process of law. These rights are secured to the Plaintiffs by the provisions of the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution and by Title 42 U.S.C. Sections 1983 and 1985.

12

regulated industry. Under the closely regulated industry exception to the warrant requirement, the Court reasoned that a warrant was not necessary for a lawful search. Thus, the District Court concluded that the Plaintiffs had not stated a claim upon which relief could be granted.

Generally, a search or seizure must be carried out pursuant to a warrant to be considered reasonable under the Fourth Amendment. *See*, *e.g.*, *Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir. 1986). In *New York v. Burger*, 482 U.S. 691 (1987), however, the Supreme Court explained that the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home. This expectation is particularly attenuated in property in 'closely regulated' industries." *Id.* at 700 (internal citation omitted). Thus, the closely regulated industry exception to the warrant requirement, based on *Colonnade Corp. v. United States*, 397 U.S. 72 (1969), and *United States v. Biswell*, 406 U.S. 311 (1972), provides that "[b]ecause the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context." *Burger*, 482 U.S. at 702 (internal citation omitted).

However, we have emphasized that "the regulated industries exception is a narrow one, and . . . a warrantless search can be placed within that exception only if it is in fact made pursuant to and in enforcement of the regulatory scheme." *United States v. Shaefer, Michael & Clairton Slag, Inc.*, 637 F.2d 200, 204 (3d Cir. 1980). The warrantless inspection of a

13

heavily regulated business will be deemed reasonable only if three criteria are met: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made," (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme,'" and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *Burger*, 482 U.S. at 702-03 (quoting *Donovan v. Dewey*, 452 U.S. 594, 600 (1981)). In short, the closely regulated industry exception to the general rule requiring a warrant to search a property requires more than a finding that the business being conducted on that property is closely regulated. It requires that the search or seizure actually be carried out in accordance with a regulatory scheme that provides a constitutionally adequate substitute for a warrant.

The issue in the present case is whether the sweeps of the Scoreboard were "in fact made pursuant to and in enforcement of the regulatory scheme" devised by the Commonwealth of Pennsylvania. Initially, this requires us to determine who actually carried out the searches. The Pennsylvania Liquor Control Board ("PLCB") "may inspect the entire licensee's premises during business hours, and cite a licensee for any violation of the Liquor Code or any law of the Commonwealth." *In Re Catering Club Liquor License No. CC-4837 Issued to Fulton Post, Inc.*, 438 A.2d 662, 663 (Pa. Commw. Ct. 1981). Pursuant to this rule, the District Court's decision was premised on its finding that "[h]ere, Defendants argue that the searches of Scoreboard were conducted at the direction of the Liquor Control Board . . . ." Based on this understanding of the facts, the searches would certainly have been valid under the closely

14

regulated industry exception. But the record is devoid of any proof that the PLCB was actually involved with all of the sweeps at issue.

When considering "the dismissal of petitioners' Fourth Amendment complaint for failure to state a claim, we can sustain the District Court's action only if, taking the allegations in the light most favorable to petitioners, we nonetheless conclude that they could prove no set of facts entitling them to relief for a [search or] 'seizure.'" *Brower v. County of Inyo*, 489 U.S. 593, 598 (1989) (internal citation omitted). Here, the Plaintiffs have alleged, consistent with their affidavit testimony, that Abington Township police, and not members of the PLCB, were responsible for carrying out the searches. While the Defendants claim that the sweeps were part of a program funded by the Commonwealth of Pennsylvania, the record contains no evidence that this is the case, and no evidence that Township police officers were ever authorized to enter a business's premises. The record does contain evidence that there was a state-funded DUI checkpoint program, but it is far from clear that this included a valid authorization for warrantless searches of establishments that provided alcohol.[5] Thus, at best there is a dispute about the nature of the sweeps and whether or not the

---

[5]The record also contains deposition testimony taken after the Fourth Amendment claim was dismissed wherein Abington Township police officers claim that some of the sweeps were conducted in conjunction with the PLCB, but this was not part of the record when the claim was dismissed, and we are required to credit the Plaintiffs' allegations over assertions by the moving party. *See Langford*, 235 F.3d at 847.

state actually authorized officers to search businesses without a warrant. At this stage of the proceedings, it was an error for the District Court to accept the Defendants' unsupported explanation of the searches rather than "taking the allegations in the light most favorable to petitioners." *Id.*

The next question before us, then, is whether the regulatory scheme at issue here authorized local police officers to carry out warrantless searches of businesses that sold liquor. If not, the Plaintiffs have alleged a possible Fourth Amendment violation by claiming that Abington Township police officers – and not members of the PLCB – searched the Scoreboard without a warrant. To make this determination, we turn to the relevant Pennsylvania statutory and case law. Section 2-211 of Pennsylvania's Liquor Code provides, in relevant part, as follows:

> (a) There is created within the Pennsylvania State Police a Bureau of Liquor Control Enforcement which shall be responsible for enforcing this act and any regulations promulgated pursuant thereto. Officers and investigators assigned to the bureau shall have the power and their duty shall be:
>
>> (1) To investigate whenever there are reasonable grounds to believe liquor, alcohol or malt or brewed beverages are being sold on premises not licensed under the provisions of this act . . . .
>>
>> . . . .

16

(3) Upon reasonable and probable cause, to search for and to seize, without warrant or process, except in private homes, any liquor, alcohol or malt or brewed beverages unlawfully possessed, manufactured, sold, imported or transported and any stills, equipment, materials, utensils, vehicles, boats, vessels, animals, aircraft, or any of them, which are or have been used in the unlawful manufacture, sale, importation or transportation of the same. Such liquor, alcohol, malt or brewed beverages, stills, equipment, materials, utensils, vehicles, boats, vessels, animals or aircraft so seized shall be disposed of as hereinafter provided.

(4) To investigate and issue citations for any violations of this act or any laws of this Commonwealth relating to liquor, alcohol or malt or brewed beverages, or any regulations of the board adopted pursuant to such laws or any violation of any laws of this Commonwealth or of the Federal Government, relating to the payment of taxes on liquor, alcohol

17

or malt or brewed beverages by any licensee, his officers, servants, agents or employes.

47 Pa. Cons. Stat. Ann. § 2-211. In addition, Section 5-513 of the Code directs that:

Every place operated under license secured under the provisions of this article where any alcohol, liquor or malt or brewed beverage covered by the license is manufactured, produced, distilled, developed or used in the process of manufacture, denatured, redistilled, rectified, blended, recovered, reused, held in bond, stored for hire or in connection with a licensee's business, shall be subject to inspection *by members of the board or by persons duly authorized and designated by the board* at any and all times of the day or night, as they may deem necessary, (a) for the detection of violations of this act or of the rules and regulations of the board promulgated under the authority of this act, or (b) for the purpose of ascertaining the correctness of the records required by this act to be kept by licensees and the books and records of licensees, and the books and records of their customers, in so far as they relate to purchases from said licensees, shall at all times be open to inspection by the members of the board or by persons duly authorized and designated by the board for the purpose of making inspections as authorized by this section. Members of the board and the persons duly

18

> authorized and designated by the board shall have the right, without fee or hindrance, to enter any place which is subject to inspection hereunder, or any place where records subject to inspection hereunder are kept, for the purpose of making such inspections.

47 Pa. Stat. Ann. § 5-513 (emphasis added). Finally, Section 4-493(21) of the Liquor Code makes it unlawful:

> For any licensee, or his servants, agents or employes, to refuse the board or the enforcement bureau[6] or any of their authorized employes the right to inspect completely the entire licensed premises at any time during which the premises are open for the transaction of business, or when patrons, guests or members are in that portion of the licensed premises wherein either liquor or malt or brewed beverages are sold.

47 Pa. Stat. Ann. § 4-493(21). Thus, we must consider whether these provisions authorized the warrantless searches of the Scoreboard by Abington Township police officers.

Faced with a similar question, the Pennsylvania Superior Court determined in *Commonwealth v. Black*, 530 A.2d 423 (Pa. Super. Ct. 1987), that these regulations did not authorize the warrantless entry and search of a licensed premises by a police officer, even if that officer was accompanied by an agent from

---

[6]The "enforcement bureau" refers to the Bureau of Liquor Control Enforcement of the Pennsylvania State Police. 47 Pa. Stat. Ann. § 1-102.

19

the PLCB. *Id.* at 430. In *Black*, the PLCB was investigating the Second Story Lounge, a private club in Reading, Pennsylvania. The Lounge was a licensee of the PLCB, and was therefore subject to the above statutory provisions of the Liquor Code. An agent of the PLCB contacted local police and requested that an officer accompany him on a search of the club. *Id.* at 425-26. Pursuant to this request, an officer from the police department accompanied several PLCB investigators on a warrantless search of the Lounge. *Id.* During the search, the officer discovered the drugs which served as the basis for the criminal charges brought against Black. *Id.*

After considering the provisions noted above, the Superior Court determined that they did not authorize the officer's warrantless search of the premises. The court first noted that "[t]he statute specifies those categories of individuals who have been entrusted to enforce the liquor laws by conducting special searches and inspections, i.e., enforcement officers, investigators, members of the board, and persons duly authorized by the board." *Id.* at 429-30. A municipal policeman, the court explained, is certainly not an enforcement officer, an investigator, or a member of the board. *Id.* at 430. In addition, the officer "did not become a '[person] duly authorized and designated by the board' simply by raiding [the Lounge] at the request of [a PLCB agent]." *Id.* Thus, "[i]n the absence of any evidence of record as to whether [the agent's] request was documented or approved by his superiors, we surely cannot regard the invitation extended to [the officer] as a form of due authorization to inspect within the meaning of the statute." *Id.* The court then noted that, viewing Sections 5-513 and 4-493(21) in conjunction, "persons duly authorized and designated by the board" under Section 5-513 were intended to

20

be "authorized employes" of the board who are under the direct supervision of board members, as per Section 4-493(21). *Id.* The court therefore held that the Pennsylvania Liquor Code does not authorize warrantless searches of licensees by municipal police officers. *Id.*

As noted above, "the regulated industries exception is a narrow one, and . . . a warrantless search can be placed within that exception only if it is in fact made pursuant to and in enforcement of the regulatory scheme." *Shaefer, Michael & Clairton Slag, Inc.*, 637 F.2d at 204. The regulatory scheme at issue here only permits warrantless inspection by specified categories of individuals, and the officers of the Abington Township Police Department are not among those individuals – especially absent evidence that they were authorized by the PLCB. 47 Pa. Stat. Ann. § 5-513; *Black*, 530 A.2d at 430. Thus, viewing the allegations in the light most favorable to the Plaintiffs, the sweeps were not in accordance with the regulatory scheme, and the District Court erred in finding that the closely regulated industry exception to the warrant requirement applied based on the record before it. By alleging that Abington Township police officers entered the premises without a warrant, the Plaintiffs have alleged sufficient facts to survive a 12(b)(6) motion. We therefore vacate the District Court's dismissal of their Fourth Amendment claim.

B.

The Plaintiffs also allege that the District Court erred by granting summary judgment in favor of the Defendants on their Fourteenth Amendment claim. We review a district court's grant of summary judgment *de novo*, applying the same test the district court would have used initially. *See*, *e.g.*, *Gordon v.*

21

*Lewiston Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005). That is, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The District Court's grant of summary judgment against the Plaintiffs was predicated on their failure to advance evidence from which a jury could conclude that a municipal policy or custom caused their injury.

In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipal liability under 42 U.S.C. § 1983 cannot be based on the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights. *Id.* at 691-95; *see also Bielevicz v. Dubinon*, 915 F.2d 845, 849-50 (3d Cir. 1990). Municipal liability only attaches when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694; *Bielevicz*, 915 F.2d at 850.

Thus, there are two ways that a plaintiff can establish municipal liability under § 1983: policy or custom. Under *Monell*, a plaintiff shows that a policy existed "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Bielevicz*, 915 F.2d at 850 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S.

22

469, 481 (1986))). A plaintiff may establish a custom, on the other hand, "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480). In other words, custom may be established by proving knowledge of, and acquiescence to, a practice. *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989).

It is clear under either route that "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz*, 915 F.2d at 850 (citing *Andrews*, 895 F.2d at 1480). In order to determine who has policymaking responsibility, "a court must determine which official has final, unreviewable discretion to make a decision or take an action." *Andrews*, 895 F.2d at 1481. It is undisputed that Chief Kelly is the relevant decisionmaker in this case.

In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered. *Bielevicz*, 915 F.2d at 850 (citing *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984)). As we have explained, "[a] sufficiently close causal link between . . . a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Bielevicz*, 915 F.2d at 851 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)).

23

In this case, the Plaintiffs submitted evidence that, at best, supports an inference that racial profiling was a common practice in the Department to increase the number of traffic tickets issued during the twenty-eight years Kelly was there, including during the time Chief Kelly was chief of police. According to Kelly, Chief Kelly should have known about this profiling because most of the Department knew. In addition, the Plaintiffs submitted evidence suggesting that Abington Township police officers regularly used racial slurs, and Kelly claimed that he was unaware of anyone ever being punished for them. According to Kelly's sworn testimony, Chief Kelly would have known about the profiling and racial slurs unless he was "totally absent," which he was not.

Assuming that this evidence, viewed in the light most favorable to the Plaintiffs, raises a genuine issue of material fact as to the Department's practices regarding racial profiling, the problem facing these Plaintiffs is that any evidence of a policy or custom ends in 1993 – five years before the first instance of misconduct alleged in this case. The only evidence they have after Gerald Kelly retired from the police force consists of affidavits regarding the behavior that is the subject of their complaint. James Barry, for example, asserted based on his personal observations as a floor manager at the Scoreboard that officers disproportionally harassed and stopped African-Americans customers in 1998 and 1999. Robert Kennedy, another Scoreboard employee, averred that he had witnessed an Abington Township police officer harassing an African-American customer. And Eugene Chapman, a Scoreboard customer, claimed that he had been stopped by officers when leaving the establishment for no apparent legitimate reason.

24

Even assuming these assertions are true, they raise no inference of a policy or practice of discrimination by the Department. As we clearly explained in *Bielevicz*, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." 915 F.2d at 850 (citing *Andrews*, 895 F.2d at 1480). The Plaintiffs have produced no evidence relating to any decisionmaker within the Department after 1993, nor do they even argue that what happened at the Scoreboard was so widespread that a decisionmaker must have known about it. Under these circumstances, a Plaintiff does not raise a reasonable inference of a well-settled custom by restating the behavior that is the subject of their complaint.

The time lapse here is even more troubling in light of the character of the evidence in the record. As noted above, "[a] sufficiently close causal link between . . . a known but uncorrected custom . . . and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Bielevicz*, 915 F.2d at 851. Typically, "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Id.* Here, however, the only evidence advanced by the Plaintiffs is evidence that officers at one point may have used racial profiling as a way to increase the number of traffic tickets they were writing and may have used racial slurs. This evidence is simply too general to sustain their claims. Our cases under *Monell* have typically involved an alleged constitutional violation that was an actual occurrence of the specific alleged custom. In *Bielewicz*, for example, we found that there was sufficient evidence of a custom of arresting

25

people for public intoxication without probable cause to support a § 1983 claim that the plaintiff had been arrested for public intoxication without probable cause. 915 F.2d at 851-52. Similarly, in *Beck v. Pittsburgh*, 89 F.3d 966 (3d Cir. 1996), we found that the plaintiff's § 1983 claim for police brutality could survive a motion for judgment as a matter of law based on evidence of the department's alleged custom of ignoring police brutality. *Id.* at 976. Here, the Plaintiffs do not have evidence that the Abington Township Police Department had a custom of raiding establishments associated with African-Americans. Nor do they present evidence suggesting that racism permeated the Department to such an extent that causation could be inferred absent evidence of a custom relating to the specific constitutional violation alleged. Coupled with the fact that their evidence is not from the relevant time-frame, the Plaintiffs have not advanced sufficient evidence to raise a triable issue of fact on their Fourteenth Amendment claim. Consequently, the District Court did not err by granting summary judgment in favor of the Defendants.

## III.

For the foregoing reasons, we will vacate the District Court's dismissal of the Plaintiffs' Fourth Amendment claim, and affirm its grant of summary judgment in favor of the Defendants on the Plaintiffs' Fourteenth Amendment claim. The case will be remanded to the District Court for further proceedings consistent with this opinion.

26