**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1683-18T4

OSBADO HERNANDEZ,

    Plaintiff-Appellant,

v.

HUDSON COUNTY, THE HUDSON
COUNTY SHERIFF'S OFFICE, and
FRANK X. SCHILLARI, individually
and in his official capacity as Sheriff of
the Hudson County Sheriff's Office,

    Defendants-Respondents.

_____

Argued December 11, 2019 – Decided July 15, 2020

Before Judges Koblitz, Whipple and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3623-16.

Matthew R. Curran argued the cause for appellant (Sciarra & Catrambone, attorneys; Matthew R. Curran and Charles Joseph Sciarra, of counsel and on the briefs).

Qing Hua Guo argued the cause for respondents County of Hudson, the Hudson County Sheriff's Office and

Frank X. Schillari in his official capacity only (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Cindy N. Vogelman, of counsel and on the brief; Qing Hua Guo, on the brief).

Kristen Jones argued the cause for respondent Frank X. Schillari (Piro Zinna Cifelli Paris & Genitempo, LLC, attorneys; Daniel Robert Bevere, on the brief).

PER CURIAM

Plaintiff appeals from the November 29, 2018 Law Division order granting summary judgment dismissal of his retaliation complaint against his employers, the County of Hudson, the Hudson County Sheriff's Office (HCSO), and Sheriff Frank X. Schillari in his official and individual capacities, collectively defendants. We affirm.

On September 7, 2016, plaintiff, then a fifteen-year veteran Hudson County Sheriff's Officer and State Delegate of the PBA Local 334, filed a complaint alleging defendants violated the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, by retaliating against him for engaging in protected union activities. The complaint alleged that plaintiff "suffered retaliatory adverse actions," including (1) a May 27, 2015 Preliminary Notice of Disciplinary Action (PNDA) and ensuing forty-five day suspension stemming

from his participation as a <u>Weingarten</u>[1] representative in a September 9, 2014 Internal Affairs (IA) interview of his co-worker and then girlfriend, Detective Vivian Rosado,[2] his subsequent failure to maintain possession of his firearm while on duty, and his failure to store his firearm while off-duty as directed outside the residence he occasionally shared with Rosado pending the outcome of the criminal complaint filed against her by her estranged husband and fellow sheriff's officer, Matthew Fedrow; (2) the January 22, 2015 Sheriff's order requiring plaintiff to store his firearm while off-duty in Jersey City, resulting in a 114.4 mile daily commute; and (3) the February 2015 temporary reassignment of plaintiff from his position as a drill and fitness instructor at the Essex County Police Academy (Academy) to the Detective Bureau at Hudson Plaza.

---

[1] <u>NLRB v. J. Weingarten, Inc.</u>, 420 U.S. 251, 256-57 (1975) (holding that under the National Labor Relations Act of 1935, 29 U.S.C. § 151-169, a union member is entitled to representation at an interview by management, where the employee reasonably believes that it will lead to disciplinary action). N.J.S.A. 34:13A-5.4(a)(1) has been interpreted to provide public employees the same right, which, if violated, will constitute an unfair labor practice. <u>Hernandez v. Overlook Hosp.</u>, 149 N.J. 68, 75 (1997).

[2] At the time, Fedrow was Vivian's last name. Following her divorce, she resumed the use of her maiden name, Rosado. Since filing the complaint, Vivian and plaintiff married and Vivian assumed plaintiff's surname. To avoid confusion, we refer to Vivian as Rosado throughout this opinion and intend no disrespect.

A-1683-18T4

We derive the following facts from evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the light most favorable to plaintiff. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)). On September 9, 2014, Rosado was directed to respond to the IA Unit to be interviewed and disarmed in accordance with the Attorney General Guidelines related to the filing of a criminal complaint against an officer. The Guidelines required the confiscation of Rosado's firearms pending the resolution of the criminal charge filed against her by Fedrow. Upon request, Rosado was permitted to bring plaintiff as her Weingarten representative. Although Captain Liane Markowitz and Sergeant Richard Garcia, the IA officers conducting the investigation, were aware of the romantic relationship between Rosado and plaintiff, they were unaware that the two were occasionally cohabitating, and plaintiff never indicated that they were. Under the circumstances, any cohabitation by plaintiff and Rosado would impact the storage of plaintiff's firearm as Rosado was not permitted to stay overnight in a residence where a firearm was located.

Garcia and Markowitz claimed that during the interview, plaintiff was "irate," "disruptive," and "unprofessional," repeatedly "interjecting" himself

into the process, and attempting to record the interview on his own device instead of relying exclusively on the official recording. Nonetheless, the interview was not discontinued as permitted under the Attorney General Guidelines. Ultimately, upon learning that Rosado kept her duty weapon at her residence in Jersey City, all four officers proceeded to her residence to retrieve the weapon. Rosado lived next door to her mother, who was present when the officers arrived. While Rosado retrieved her weapon, plaintiff complained in the presence of Rosado's mother that it was unfair that Rosado had to forfeit her weapon while Fedrow, against whom Rosado had filed an earlier harassment complaint,[3] did not. When Rosado's mother accompanied the officers back to the IA Unit, plaintiff continued to disparage the agency in her presence.

Subsequently, on September 25, 2014, plaintiff submitted a memorandum to Markowitz notifying IA that as of September 25, 2014, he would no longer store his firearm at his residence. Instead, plaintiff requested permission to store his firearm overnight at the Academy, where he was temporarily assigned as an instructor. Sheriff Schillari denied the request, explaining that the HCSO had

---

[3] Rosado had also sought a temporary restraining order against Fedrow, but the application was denied. Although Fedrow was ultimately disarmed as a result of Rosado's harassment complaint, the disarming did not occur until later.

no jurisdiction or control over the Academy and was therefore unable to monitor the storage of the firearm.

Initially, on September 25, 2014, IA officers verbally directed plaintiff to secure his firearm at Hudson Plaza, a county building that housed several offices, including the Patrol Division of the HCSO. However, upon realizing that Fedrow was the night shift supervisor there, which could lead to a confrontation between the two, IA officers promptly countermanded the order and directed plaintiff to store his firearm at the HCSO Court Bureau located in the Hudson County Courthouse. The Court Bureau had sign-in/sign-out procedures, gun lockers, and a desk supervisor under the direct supervision of the HCSO's chain of command.

The verbal order was later memorialized in a written communication to plaintiff from Garcia dated December 19, 2014, as well as a written communication to Court Bureau personnel from Markowitz dated January 5, 2015. Based on the order, plaintiff was expected to deposit his firearm in the designated locker in the Court Bureau at the end of each shift and retrieve it in the morning before traveling to his post at the Academy. However, in a December 19, 2014 report to Garcia, plaintiff confirmed that he had placed his firearm in the locker at the Court Bureau on September 26, 2014, after being

verbally advised to do so, and did not retrieve it until December 19, 2014. As a result, plaintiff reported for duty during this time period without his firearm, contrary to the HCSO policy that all officers be armed while on duty.[4]

On January 22, 2015, plaintiff was notified in writing by Garcia that, pursuant to the Sheriff's order, he was required to maintain his firearm at all times while on duty, regardless of his assignment. On January 23, 2015, plaintiff was notified in writing by Markowitz that he was the subject of an IA investigation for "failure . . . to maintain [his] firearm while on[-]duty . . . from [September 21, 2014] to present." As a result, subsequently, plaintiff himself underwent an IA interview, accompanied by his Weingarten representative. While the IA investigation was pending, in February 2015, plaintiff was temporarily reassigned from the Academy to the Detective Bureau at Hudson Plaza. Thereafter, on May 27, 2015, plaintiff was served with a PNDA, charging him with 1) conduct unbecoming a public employee; 2) insubordination; and 3) other sufficient cause.

The PNDA specified that while plaintiff served as Rosado's Weingarten representative on September 9, 2014, he "acted in a disruptive manner when he

---

[4] The HCSO Uniform Firearms Policy (Hudson County Firearms Policy) provides that, "all sworn members shall be armed while on[-]duty unless otherwise authorized by the Sheriff or Chief."

continually interrupted members of the [IA] Unit while an official inquiry was being conducted." Further, the PNDA alleged plaintiff "failed to secure his weapon as directed" to avoid Rosado's "access to firearms" while a criminal complaint filed against her by her estranged husband was pending, and "failed to maintain possession of his firearm while he was on[-]duty" from "December 21, 2014 through January 23, 2015." The PNDA indicated that disciplinary action may range from thirty days' suspension to removal.

A disciplinary hearing was conducted on July 1, 2015, where plaintiff was represented by counsel. In addition to Garcia's testimony, numerous exhibits were presented, including the audio recording of the September 9, 2014 IA interview, witness statements, and the IA investigation report. Plaintiff conceded that he had not carried his firearm while he was on duty during the period in question, but contended he was never directed "to pick up [his] weapon to go to the [A]cademy every day." He stated that

> in [his] current assignment as a [d]rill and fitness instructor . . . [his] uniform of the day is [sweatpants] and a [sweatshirt]. It would be dangerous to carry [his] weapon with that attire due to the performance of [his] duty. All of the instructors in the academy that are [full-time] have the same attire as [he does] with no weapon on them.

On September 17, 2015, the hearing officer (HO) dismissed the charge of conduct unbecoming an officer, but upheld the insubordination charge. In a written opinion, the HO noted that plaintiff "should have known better," and "made an error in judgment in deciding to officially represent his union member while he was in a relationship with her." However, the HO found that, under the circumstances, the unbecoming conduct charge was inappropriate. As to the insubordination charge, while the HO accepted plaintiff's statement that he "believed it was dangerous for him to carry his weapon because of the type of uniform employed while he was an instructor[,]" the HO credited Garcia's testimony and rejected plaintiff's explanation "that he did not clearly understand his instructions." Instead, the HO found that plaintiff "intentionally did not abide by the orders that were given to him as concerns his weapon . . . from when he made his initial request [to store his weapon at the Academy] until an[d] including January 23[], 2015."

After considering plaintiff's disciplinary record, consisting of a twenty-day suspension in 2013 for "[u]nbecoming [c]onduct, [n]eglect of [d]uty, [and] [i]nsubordination," the HO recommended a forty-five-day suspension, without pay. The Sheriff signed a Final Notice of Disciplinary Action (FNDA) on October 15, 2015, memorializing his approval of the disciplinary action.

Plaintiff served his suspension over nonconsecutive days in October, November, and December of 2015, and January and February of 2016.

Following the completion of discovery, defendants moved for summary judgment over plaintiff's objection. Defendants asserted that contrary to plaintiff's allegations, while the chronological genesis of the PNDA, the order requiring plaintiff to store his firearm while off-duty at the Court Bureau, and his temporary reassignment may have begun with the September 9, 2014 IA interview, the actions were based on entirely separate conduct and were not retaliation for plaintiff engaging in protected union activities.

Following two days of oral argument, the judge entered orders granting defendants' motion and dismissing the complaint with prejudice. In a November 29, 2018 written opinion accompanying the orders, the judge posited that "[t]he real issue . . . [was] whether the acts of the defendants could reasonably qualify as 'retaliation' under the summary judgment standards." After applying the governing legal principles, the judge concluded that they did not.

The judge explained:

> The first count of the PNDA . . . goes beyond merely complaining about plaintiff's interruptions during the interview with . . . Rosado. It goes into facts (apparently undisputed as conceded at oral argument) about the scene plaintiff made with . . . Rosado's mother consisting of very disparaging remarks about

A-1683-18T4

the [IA] unit, including the use of vulgarity. Not just equally important but more important it complains about plaintiff's lack of forthrightness in not acknowledging [on that date] that not only was he dating . . . Rosado but that cohabitation (meaning she would have access to his gun) was taking place. That . . . plaintiff thought better and a few weeks later acknowledged the cohabitation did not cure his lack of candor on September 9, 2014. Based on these [undisputed] facts no reasonable juror could conclude that this action was based (wholly or even partially) on plaintiff's legitimate role as a [Weingarten] representative.

The second count of the PNDA deals with plaintiff's alleged failure to store his gun at the [C]ourt [B]ureau and pick it up each day and return it at the end of each day before going home. The PNDA alleges that on September 25, 2014 (when it first became known that plaintiff was cohabitating with . . . Rosado) plaintiff requested to be allowed to leave his gun overnight at the . . . Academy and this request was specifically denied, with plaintiff being told to bring his gun to work each day and store it at night at the [HCSO].

. . . [P]laintiff denies being given these specific verbal instructions to pick up and retrieve his gun each day. The court must accept . . . plaintiff's denial as far as this motion is concerned. The PNDA, however, goes on to claim that these specific instructions were contained in the December 19, 2014 written memo from . . . Garcia to . . . plaintiff. That memo did indeed refer to both "securing [his] firearm" and "picking up [his] firearm[.]" The PNDA specifically claims that plaintiff's failure from December 19, 2014, (when he received the written memo) going forward to January 23, 2015, was insubordination.

A-1683-18T4

After detailing defendants' arguments, the judge continued:

> For purposes of summary judgment the court will disregard [defendants'] arguments that plaintiff did not misunderstand anything and will assume that plaintiff did misunderstand the written memo of December 19, 2014, and did not receive the verbal instructions on September 25, 2014. This[,] however, does not require the court to find a reasonable juror could infer that the written memo of December 19, 2014, was intentionally ambiguous and was therefore[] a "setup" to confuse . . . plaintiff and thus justify the PNDA as counsel alleges. This is simply too farfetched. Nobody could reasonably infer that the written memo and the PNDA (based on the written memo being ignored) was a calculated act of retaliation for plaintiff's mere role on September 9, 2014, as a [Weingarten] representative.

Turning to the order requiring plaintiff to store his firearm while off-duty at the Court Bureau instead of the Academy, the judge expounded:

> Related to this discussion is plaintiff's contention that the requirement that plaintiff store his gun at the sheriff's office, as opposed to letting him store it at [the Academy], was an act of retaliation. Since it is the officer's department that is responsible for securing the weapon[,] there is simply nothing untoward in the Hudson County Sheriff requiring that the gun be secured at the [HCSO] and logged in and logged out at that facility, where the logging can be monitored, as indeed it was. The fact that p1aintiff was trusted to log in and log out as opposed to having another sheriff's officer standing directly behind him each time to ensure it, does not mean that the obligation to log his gun was "pretextual" as plaintiff claims and thus an act of retaliation. That also, is simply farfetched.

12

Regarding his temporary reassignment from the Academy, the judge stated:

> As to . . . plaintiff's temporary reassignment in February 2015 away from the . . . Academy[,] the only evidence properly in the record is the [S]heriff's assertion that it was requested by the [D]irector of the [A]cademy. This action was also recommended by . . . Garcia of [IA]. At his deposition[,] the [S]heriff was originally unsure as to why . . . plaintiff was temporarily removed. At oral argument[,] plaintiff's counsel indicated he had a tape of a phone conversation in which the [A]cademy [D]irector made a statement indicating a willingness to have . . . plaintiff return. This statement was not under oath, the [D]irector was not deposed and even the statement did not address whether or not the [D]irector requested the transfer.

The judge concluded:

> When it comes to [Weingarten] representation, which is what plaintiff asserts . . . defendants were retaliating against, there is simply nothing in this record to show [animus]. Not only did the [S]heriff's [O]ffice not hinder it, on the only two occasions involved[,] it seemed to go out of its way to facilitate it. On September 9, 2014, the [IA] officers were aware of a conflict of interest due to the dating relationship (but not the cohabitation at that point). However[,] since . . . Rosado had requested . . . plaintiff and the goal was simply to retrieve the weapon[,] they overlooked it. Had there been any [animus] this would have . . . presented an excellent opportunity to bar . . . plaintiff and insist on another representative. On [January 23, 2015], when plaintiff acknowledged the cohabitation and was now himself the subject of the [IA] interview,

13

the [S]heriff's [O]ffice notified him that his requested representative was literally ineligible and recommended an alternative whom the plaintiff readily accepted.

While a reasonable juror could discern [animus] toward . . . plaintiff by the [IA] officers and possibly even the [S]heriff, it could only have resulted from the scene . . . plaintiff made on the street embarrassing [IA] and the [S]heriff's [O]ffice, his failure to initially acknowledge his cohabitation with . . . Rosado and the "misunderstanding" regarding the securing of the gun. If they felt that between September 9, 2014, and September 25, 2014, when . . . plaintiff did bring his gun home[,] that . . . Rosado had access to it and . . . plaintiff knew this was wrong, they had a right to be peeved. If, in their eyes plaintiff was still causing trouble by not following their instructions in securing the gun, they also had a right to some [animus]. But linking that [animus] to plaintiff's legitimate role as a [Weingarten] representative is simply not "reasonable[.]"

The judge also concluded:

To the degree that plaintiff alleges "disparate treatment[,]" the examples are not similar to the present matter in terms of their background and are not really all that disparate in nature. To suggest that any minor instances of difference (such as another officer securing his firearm without having to log in and out) is sufficient proof of retaliation for plaintiff's legitimate role as a [Weingarten] representative is indeed too far of a stretch.

Finally, addressing the Sheriff's qualified immunity, the judge explained:

14

While the [S]heriff individually would be entitled to qualified immunity since what he did in relying on the advice and information presented by his [IA] officers made his conduct regarding the PNDA[] "objectively reasonable[,]" there is no reason to discuss that further or Monell[5] liability, as none of the sheriff's officers could "reasonably" be found to have acted in violation of the [NJCRA] as a matter of law.

On appeal, plaintiff argues "the evidence in the record is sufficient to defeat summary judgment due to the inferences of animus" that may be drawn and the "evidence of pretext" that "abounds." Essentially, plaintiff asserts the judge erred in granting summary judgment to defendants because there were genuine issues of material fact. We disagree.

We review a grant of summary judgment applying the same standard used by the trial court. Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court "must deny the motion." On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Ibid. (quoting R. 4:46-2(c)); see Brill, 142 N.J. at 540.]

---

5 Monell v. New York City Dept. of Social Servs., 463 U.S. 658 (1978).

"[T]he legal conclusions undergirding the summary judgment motion itself [are reviewed] on a plenary de novo basis." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 385 (2010).

"The practical effect of [Rule 4:46-2(c)] is that neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). In that regard, "[s]ummary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, ___ N.J. ___, ___ (2020) (slip op. at 30) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

Pertinent to this appeal, the NJCRA provides a private cause of action for damages, injunctive or other appropriate relief to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges, or immunities secured by the Constitution or laws of the United States, or . . . of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law . . . .
>
> [N.J.S.A. 10:6-2(c).]

A cause of action brought under the NJCRA has the same elements as the analogous federal Civil Rights Act, 42 U.S.C. § 1983 (Section 1983), after which the NJCRA was modeled. Rezem Family Assocs. L.P. v. Borough of Millstone, 423 N.J. Super. 103, 115 (App. Div. 2011). Thus, New Jersey state courts may look to federal cases analyzing Section 1983 to interpret the NJCRA's provisions. See Tumpson v. Farina, 218 N.J. 450, 474 (2014) ("The interpretation given to parallel provisions of Section 1983 may provide guidance in construing our Civil Rights Act.").

The NJCRA "was adopted 'for the broad purpose of assuring a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection.'" Ramos v. Flowers, 429 N.J. Super. 13, 21 (App. Div. 2012) (quoting Owens v. Feigin, 194 N.J. 607, 611 (2008)). See also Gormley v. Wood-El, 218 N.J. 72, 97 (2014) ("Section 1983 applies only to deprivations of federal rights, whereas N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws."). To that end, similar to a cause of action under Section 1983, in order to prevail under the NJCRA, a plaintiff must first identify "'the person acting under color of law[]' that has caused the alleged deprivation," and then "identify a 'right, privilege or immunity' secured to the

claimant" by the state or federal constitution or state or federal laws. <u>Rezem</u>, 423 N.J. Super. at 115 (quoting <u>Rivkin v. Dover Twp. Rent Leveling Bd.</u>, 143 N.J. 352, 363 (1996)).

"We have recognized two types of claims under the [NJCRA]: first, a claim for when one is 'deprived of a right,' and second, a claim for when one's 'rights are interfered with by threats, intimidation, coercion or force.'" <u>Trumpson, 431 N.J Super. at 181-82.</u> (quoting <u>Felicioni v. Admin. Office of Courts</u>, 404 N.J. Super. 382, 400 (App. Div. 2008)). However, "[i]nterference with a right need not actually result in actual deprivation of the right." <u>Id. at 182.</u> Here, there is no dispute that plaintiff serving as a <u>Weingarten</u> representative for Rosado constitutes a protected activity under N.J.S.A. 34:13A-5.4(a)(1), with underpinnings in the First Amendment.[6] <u>See</u> <u>Hernandez</u>, 149 N.J. at 75. Thus, interference or attempted interference with the exercise of that right by retaliation constitutes "threats, intimidation or coercion" cognizable under N.J.S.A. 10:6-2(c).

---

[6] "[U]nion membership is worthy of constitutional protection" and there is longstanding Supreme Court precedent "that a public employee possesses a First Amendment right to associate with a union." <u>Palardy v. Twp. of Millburn</u>, 906 F.3d 76, 82 (3d Cir. 2018). "The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." <u>Smith v. Ark. State Highway Emp., Local 1315</u>, 441 U.S. 463, 465 (1979).

However, in order to establish a prima facie case that defendants' acts constitute retaliation as alleged in his complaint, plaintiff must show that he (1) "engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." Ibid.

When, as here, the question does not turn on whether the plaintiff engaged in a protected activity or whether the defendants engaged in the conduct alleged, "but rather whether there was a causal relationship between the two," in order "[t]o establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Ibid. "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation." Ibid. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)).

19

However, as the court pointed out in <u>DeFlaminis</u>,

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. . . . [B]y enforcing the requirement that a plaintiff show causation in a retaliation case, [courts] . . . will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors . . . must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

> [<u>Id.</u> at 267-68.]

Here, we agree with the judge that plaintiff failed to establish the requisite causal connection between his protected activity and defendants' alleged retaliatory conduct to survive a motion for summary judgment on a retaliation claim. Viewed in the light most favorable to plaintiff, the record as a whole simply does not support an inference that defendants' actions constituted retaliation for plaintiff engaging in protected activity in his role as Rosado's <u>Weingarten</u> representative during the September 9, 2014 IA interview. While the record is replete with accusations of animus and allegations of disparate

treatment, "[a] motion for summary judgment will not be defeated" by "disputed facts 'of an insubstantial nature.'" Worthy v. Kennedy Health Sys., 446 N.J. Super. 71, 85 (App. Div. 2016) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:46-2 (2020)). Moreover, "'fanciful, frivolous, gauzy or merely suspicious' allegations of fact in support of the claim" will not forestall summary judgment dismissal. Maher v. N.J. Transit Rail Operations, 125 N.J. 455, 477-78 (1991) (quoting Judson v. Peoples Bank & Tr. Co., 17 N.J. 67, 74 (1954)).

Plaintiff also contends that in granting defendants summary judgment, the judge erred in failing to analyze "[Monell] liability based upon the deliberate indifference standard." In Monell, the United States Supreme Court "held that official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." Polk Cty. v. Dodson, 454 U.S. 312, 326 (1981) (quoting Monell, 436 U.S. at 694). While a Section 1983 claim may be based on a plaintiff showing that a governmental entity's actions evidence "a 'deliberate indifference' to [his or her] rights," City of Canton v. Harris, 489 U.S. 378, 389 (1989), in order to be actionable, a plaintiff must "show that the [government body], through one of its policymakers, affirmatively proclaimed a policy, or acquiesced in a widespread

21

custom, that deprived the plaintiff of his constitutional rights." Coles v. Carlini, 162 F. Supp. 3d 380, 401 (D.N.J. 2015). See Hafer v. Melo, 502 U.S. 21, 25 (1991) ("[T]he entity's policy or custom must have played a part in the violation of federal law." (quoting Kentucky v. Graham, 473 U.S. 159, 167 (1985))).

A government policy may be established "when a 'decisionmaker possess[ing] final authority to establish a . . . policy with respect to the action' issues an official proclamation, policy, or edict." McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009) (alteration in original) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanently and well-settled' as to virtually constitute law." Ibid. (quoting Andrews, 895 F.2d at 1480). "Custom requires proof of knowledge and acquiescence by the decisionmaker." Ibid. "In either instance, a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).

"However, proof of the mere existence of an unlawful policy or custom is not enough to maintain a [Section] 1983 action." Ibid. Rather, "[a] plaintiff

22

bears the additional burden of proving that the . . . practice was the proximate cause of the injuries suffered." Ibid. "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the . . . custom and the specific deprivation of constitutional rights at issue." Ibid. (citations omitted). See Harris, 489 U.S. at 385 ("[O]ur first inquiry in any case alleging [a governmental entity's] liability under [Section] 1983 is the question whether there is a direct causal link between [the entity's] policy or custom and the alleged constitutional deprivation."); City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985) ("[T]here must be an affirmative link between the policy and the particular constitutional violation alleged."). Here, in the absence of a causal link between the purported policy or custom and the constitutional infringement, defendants cannot be held liable under Section 1983 or the NJCRA.

Plaintiff also argues the judge erred in finding that the Sheriff was entitled to "qualified immunity." Plaintiff asserts that because the Sheriff admitted being aware that union activities are afforded constitutional protection, he should have been held separately liable for authorizing the actions of the IA officers or "act[ing] with deliberate indifference to the[ir] abuses."

"The affirmative defense of qualified immunity protects government officials from personal liability for discretionary actions taken in the course of their public responsibilities, 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Brown v. State, 230 N.J. 84, 97-98 (2017) (quoting Morillo v. Torres, 222 N.J. 104, 116 (2015)). The defense applies to NJCRA claims and "tracks the federal standard, shielding from liability all public officials except those who are 'plainly incompetent or those who knowingly violate the law.'" Id. at 98 (quoting Morillo, 222 N.J. at 118). The defense "balances two important interests - the need to hold the public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

> To ascertain whether a governmental official . . . is entitled to qualified immunity requires inquiries into whether: (1) the facts, "[t]aken in the light most favorable to the party asserting the injury[] . . . show the officer's conduct violated a constitutional right"; and (2) that constitutional "right was clearly established" at the time that defendant acted.
>
> [Brown, 230 at 98. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).]

Here, although the judge determined the Sheriff was entitled to qualified immunity in relying on the recommendations of the IA officers, because the judge based the summary judgment dismissal on plaintiff's failure to establish a prima facie NJCRA claim, there was no need to apply the doctrine of qualified immunity. Based on our de novo review, we are convinced the judge's analysis is supported by the record and the applicable legal principles, including the summary judgment standard.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION